**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CERTAINTEED CORPORATION,**
a/k/a CertainTeed Corporation, Roofing
Products Group
a Delaware Corporation,
and

and

**SAINT-GOBAIN CORPORATION,**
a Pennsylvania Corporation

and

**HUSNU M. KALKANOGLU,**
a Pennsylvania Citizen,

and

**THOMAS M. SMITH,**
a Pennsylvania Citizen,

and

**ROBERT E. GARDNER,**
a Pennsylvania Citizen,

and

**MARK STANCROFF,**
a Pennsylvania Citizen

Plaintiffs,

v.

**BIPV, INC.,**
a Nevada Corporation

Defendant.

CIVIL ACTION NO.:_____

## COMPLAINT

Plaintiffs CertainTeed Corporation, Saint-Gobain Corporation, Husnu M. Kalkanoglu, Thomas M. Smith, Robert E. Gardner, and Mark Stancroff (collectively, "CertainTeed") seek a Declaratory Judgment that they have not: (1) breached the 2010 Nondisclosure Agreement; (2) breached the 2012 Nondisclosure Agreement; (3) breached Purchase Order Number 3000160722 between CertainTeed Corporation and Defendant; (4) breached any California Covenant of Good Faith and Fair Dealing implied in the 2010 and/or 2012 Nondisclosure Agreements; (5) fraudulently induced Defendant into entering the 2010 Nondisclosure Agreement; (6) fraudulently induced Defendant into entering the 2012 Nondisclosure Agreement; (7) misappropriated any of Defendant's alleged Trade Secrets under the Uniform Trade Secrets Act or the California Trade Secrets Act; and/or (8) misappropriated any of Defendant's alleged Trade Secrets under the Common Law, as alleged in the BIPV, Inc. Draft Complaint attached hereto as Exhibit "A".  CertainTeed seeks an award of attorney's fees and costs incurred in obtaining these Declaratory Judgments.

In addition, Plaintiff CertainTeed Corporation brings this Action against Defendant BIPV, Inc. for Breach of Contract for which it seeks Compensatory Damages in an amount to be proven at Trial.

## THE PARTIES

1.      Plaintiff CertainTeed Corporation, also known as CertainTeed Corporation, Roofing Products Group, a subsidiary and affiliate of Pennsylvania Corporation Saint-Gobain Corporation, is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 20 Moores Road, Malvern, Pennsylvania 19355.

2.      Plaintiff Saint-Gobain Corporation is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 20 Moores Road, Malvern, Pennsylvania 19355.

3.      Plaintiff Husnu M. Kalkanoglu is a Citizen of the Commonwealth of Pennsylvania residing in this Judicial District.

4.      Plaintiff Thomas M. Smith is a Citizen of the Commonwealth of Pennsylvania residing in this Judicial District.

5.      Plaintiff Robert E. Gardner is a Citizen of the Commonwealth of Pennsylvania residing in this Judicial District.

6.      Plaintiff Mark Stancroff is a Citizen of the Commonwealth of Pennsylvania residing in this Judicial District.

7.      With respect to Messrs. Kalkanoglu, Smith, Gardner, and Stancroff, these Plaintiffs are included in this Action only because they are included as putative Defendants in the Draft Complaint sent by BIPV, Inc. and attached as Exhibit "A".  As a result of the threatened litigation against them personally, these individuals seek a Declaratory Judgment from this Honorable Court despite BIPV, Inc. lacking any good faith factual or legal basis for threatening litigation against them in their individual capacity.

8.      Upon information and belief, Defendant BIPV, Inc. is a corporation organized under the laws of the State of Nevada and with a principal place of business located at 908 Taylorville Road, Suite 203, Grass Valley, California  95949.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this Declaratory Judgment action pursuant to the Federal Declaratory Judgment Act, Title 28 U.S.C. §§ 2201(a) and 2202, as well as under Title 28 U.S.C. §§ 1331 and 1338(a).

10.     This Court has jurisdiction pursuant to Title 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction over CertainTeed Corporation's claim for Breach of Contract as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Alternatively, this Court may exercise Supplemental Jurisdiction over CertainTeed Corporation's claim for Breach of Contract pursuant to Title 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendant because, upon information and belief, the subject matter of this litigation arises from Defendant's contacts with this Forum including, but not limited to, contracts entered into/in and with Citizens of this Commonwealth, and has caused a consequence in this Commonwealth by threatening litigation against Plaintiffs.

14.     Venue is proper in this district under Title 28 U.S.C. §§ 1391(b) and (c).

## RELEVANT FACTS

15.    CertainTeed is a worldwide building materials manufacturer offering such products as roofing, vinyl siding, decking and railing, fiber glass insulation, gypsum, ceilings, and fencing.

16.    CertainTeed routinely and continuously invests substantial resources and time developing new products and improvements to products to support its materials manufacturing business through its internal research and development efforts.

17.    Upon information and belief, BIPV is a manufacturer of building integrated photovoltaic application products such as solar shingles and tiles.

18.    On December 16, 2010, the United States Patent and Trademark Office published Patent Application Number 12/803,913, the Inventor and Applicant for which was Ron Gangemi, principal of BIPV. *See* Exhibit "B". Although this Application was subsequently abandoned, once published, nothing contained therein could be Confidential, Proprietary, or Trade Secret.

19.    Upon information and belief, BIPV's products were commercially available as early as 2010, prior to CertainTeed entering into any agreement with BIPV.

## THE OCTOBER 28, 2010 NONDISCLOSURE AGREEMENT

20.    On October 28, 2010, Plaintiff CertainTeed Corporation and Defendant, along with non-party Connect by Computer, LLC d/b/a Sun Energy Engineering Company, entered into a Nondisclosure Agreement, a copy of which is attached as Exhibit "C".

21.   The 2010 Nondisclosure Agreement was entered into in order to facilitate evaluation and negotiation of a potential business relationship relating to a potential business relationship concerning "Roof Integrated Photovoltaic Products and Associated Components and Accessories and Development Thereof."

22.   In relevant part, the 2010 Nondisclosure Agreement prohibited the receiving party from "disclos[ing] or permit[ting] the disclosure to any third party of any Confidential Information disclosed to it by the disclosing party or such disclosing party's affiliates or representatives." *Id.* at ¶2.

23.   The 2010 Nondisclosure Agreement provided that it would expire on its own terms two (2) years after its execution, *i.e.*, on October 27, 2012. *Id.* at ¶18.

24.   The 2010 Nondisclosure Agreement further provided that "[e]ither party may terminate discussions relating to the Project and this Agreement at any time upon written notice to the other party, provided that Recipient's obligations hereunder with respect to Confidential Information disclosed prior to any such termination shall continue for five (5) years following such termination date." *Id.*

25.   No party to the Agreement provided written notice of its termination. As a result, the 2010 Nondisclosure Agreement expired on October 27, 2012 without triggering the additional five (5) year period of nondisclosure, which the terms of the Nondisclosure Agreement restricts only to cases of early termination.

26.     Finally, the 2010 Nondisclosure Agreement provides that it "shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of law." *Id.* at ¶21.

27.     Upon execution of the 2010 Nondisclosure Agreement, Mr. Ron Gangemi, principal of BIPV, traveled to the Commonwealth of Pennsylvania in or about November of 2010 to discuss future collaboration and product development between BIPV and CertainTeed.

## THE AUGUST 23, 2011 PRIVATE LABEL AGREEMENT

28.     On or about August 23, 2011, Plaintiff "CertainTeed Corporation, Roofing Products Group" entered into a Private Label Supply Agreement with Defendant, which is attached as Exhibit "D".

29.     Pursuant to the Private Label Supply Agreement, Plaintiff agreed only that "[f]rom time to time during the Term (as defined below), [CertainTeed] shall purchase from [BIPV], and [BIPV] shall procure and sell to [CertainTeed] such quantities of the Products as [CertainTeed] orders." *Id.* at ¶1.1.   The Private Label Supply Agreement did not require CertainTeed to purchase any minimum amount of product.

30.     The Private Label Supply Agreement further provided that "[s]uch sales and purchases shall be made in accordance with [CertainTeed's] firm purchase orders." *Id.*

31.     The Private Label Supply Agreement further provides that the agreement "shall commence as of the date hereof and continue until either party terminates this Agreement by giving the other no less than 90 days prior written notice." *Id.* at ¶3.

32.     Importantly, the Private Label Supply Agreement also provides that "[u]pon termination of this Agreement for any reason (including, without limitation, its expiration according to the terms hereof), neither party shall be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or commitments made by such party in connection with this Agreement or otherwise in connection with its business except as otherwise set forth in Section 4 with respect to warranties, remedies and reimbursement." *Id.* at ¶5.2.

33.     Section 5.2 of the Private Label Supply Agreement, however, does "not affect the parties' rights and obligations with respect to Product delivered, or other actions taken, hereunder prior to termination . . . ." *Id.*

34.     As a result, the only obligations that survive post-termination of the Private Label Supply Agreement are the warranties, remedies, and reimbursement that Defendant owes to Plaintiff as set forth in Section 4 of the Private Label Supply Agreement and claims relating to products already delivered under same, including Breach of the Warranties set forth in Exhibit "D" to the Private Label Supply Agreement.

35.     The Private Label Supply Agreement is a fully integrated agreement with the exception of the October 28, 2010 Nondisclosure Agreement, which is exempted. *Id.* at ¶8.9.

## THE JANUARY 6, 2012 NONDISCLOSURE AGREEMENT/LETTER

36.     On January 6, 2012, Plaintiff CertainTeed Corporation and Defendant, entered into a second Nondisclosure Agreement/Letter, a copy of which is attached as Exhibit "E".

37.     The 2012 Nondisclosure Agreement was similarly entered into in order to facilitate evaluation and negotiation of a potential business relationship relating to the development and sale of roofing products.

38.     In relevant part, the 2012 Nondisclosure Agreement provided that any material provided thereunder ("Evaluation Material"), would "be used soly for the purpose of evaluating a possible transaction between the Company and us or one of our Affiliates . . . ." *Id.* at 2.

39.     The 2012 Nondisclosure Agreement specifically excluded from the term "Evaluation Material" any information: (1) that was already known to Plaintiffs; (2) information that becomes generally available to the public; (3) became available to Plaintiffs on a non-confidential source; and/or (4) was independently developed by Plaintiffs. *Id.* at 1.

40.     The 2012 Nondisclosure Agreement provides that it "shall terminate upon the earlier of (i) the consummation of the proposed transaction or (ii) two (2) years after the date of this letter. *Id.* at 2.

41.     Finally, the 2010 Nondisclosure Agreement provides that it "shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of law." *Id.* at 3.

## BIPV BREACHES THE 3000160722 PURCHASE ORDER

42.     On January 1, 2012, CertainTeed Corporation issued Purchase Order Number 3000160722 to BIPV, Inc. for a collective 4,320 Units of Apollo PV Sun Energy Shingle 52W Std Cel. A copy of the Purchase Order is attached as Exhibit "F".

43.     The Purchase Order was made pursuant to CertainTeed's standard Terms and Conditions. *See id.* ("The terms and conditions of this Purchase Order, pursuant to which all purchases by the Company of goods and services are made, are available at http://www.saint-gobain-corporation.com/ and together with the Purchase Order represent the entire agreement between the Company and the Seller."). *Id.*

44.     A copy of CertainTeed's Terms and Conditions governing Purchase Orders is attached as Exhibit "G".

45.     Those Terms and Conditions state that "Buyer may at any time, without cause, terminate the Purchase Order in whole or in part upon written notice to Seller. Seller shall be entitled to a reasonable termination fee consisting of a percentage of the Purchase Order price reflecting the percentage of work, goods delivered or services properly performed prior to termination. Payment of such termination fee shall be Seller's sole remedy." *Id.* at ¶15.

46.     Prior to BIPV's fulfillment of this Purchase Order, however, CertainTeed experienced significant issues caused by defects in BIPV's products that caused product failure shortly after installation.

47.     As a result of these defects, on June 24, 2013, CertainTeed exercised its right to, with or without cause, "terminate the Purchase Order in whole or in part . . . ." *Id.*; *see also* Exhibit "H".

48.     In the same communication, CertainTeed terminated the Private Label Supply Agreement, thereby triggering the limitation of liability set forth in Section 5.2 therein.

49.     However, pursuant to Section 5.2 of the Private Label Supply Agreement, CertainTeed maintains its Cause of Action relating to BIPV's Breach of its Warranties and Representations with respect to previously delivered product, including those set forth in Exhibit "D" to the Private Label Supply Agreement.

50.     Specifically, in the Terms and Conditions governing all of CertainTeed's purchases from BIPV, BIPV "expressly warrants that for a period of one year after Buyer's acceptance of the goods or services hereunder . . . all goods and services covered by this Purchase Order will . . . (b) be free from defects in design, material and workmanship, (c) be of merchantable quality and suitable for the particular purposes intended, whether express or reasonably implied . . . ." Exhibit "G" at ¶9.

51.     Because of BIPV's Breach of its Warranties, CertainTeed is entitled to "revoke acceptance as to any portion of the goods or services accepted, and return such goods to Seller and to recover the purchase price, any excess costs of cover, and damages, including manufacturing costs, costs of removal or recall, transportation and custodial expenses, injury to person or property incurred by Buyer, all in addition to Buyer's other remedies under this Purchase Order or applicable law." *Id.* at ¶10.

52.     Despite demand by CertainTeed, BIPV has refused to recompense CertainTeed for the damages incurred as a result of BIPV's Breach.

## THREAT OF LEGAL ACTION

53.     On December 23, 2015, Counsel for BIPV sent a letter to Plaintiffs, which enclosed a Draft Complaint and asserted that the Draft Complaint would be filed on January 8, 2016 if Plaintiffs did not accede to BIPV's exorbitant and legally meritless demands.  A copy of

Counsel's December 23, 2015 Letter, and accompanying Draft Complaint, is attached hereto as Exhibit "I".

54.    In addition to threatening claims against the corporate CertainTeed entities with which it had contracted, BIPV also threatened claims against CertainTeed executives in their individual capacities for alleged breaches of agreements to which they were not parties.

55.    The instant action is necessary to address the specific issues as to whether (1) Plaintiffs breached the 2010 Nondisclosure Agreement; the 2012 Nondisclosure Agreement; the Private Label Supply Agreement and any Purchase Orders issued thereunder; any implied Covenant of Good Faith and Fair Dealing; (2) Plaintiffs induced Defendant enter the 2010 Nondisclosure Agreement and/or 2012 Nondisclosure Agreement through fraud; (3) and/or whether Plaintiffs misappropriated any alleged Trade Secrets of Defendant either pursuant to the Uniform Trade Secrets Act or the Common Law, as alleged BIPV's Draft Complaint.

56.    BIPV's bad faith threats and claims, without a reasonable basis for the same, constitutes bad faith, entitling CertainTeed to all of its attorneys' fees and costs in bringing/defending this action.

## FEDERAL DECLARATORY JUDGMENT ACT

57.    Pursuant to the Federal Declaratory Judgment Act, Title 28 U.S.C. § 2201, this Court may declare the rights and other legal relations of any interested party.

58.    As set forth above, BIPV asserts that CertainTeed breached its obligations under the 2010 and 2012 Nondisclosure Agreements; fraudulently induced BIPV to enter into those Agreements; breached its obligations under purchase orders issued under the Private Label

Supply Agreement; breached its Duty of Good Faith and Fair Dealing; and misappropriated BIPV's alleged Trade Secrets under the Uniform Trade Secrets Act and/or the Common Law.

59. There exists a real and substantial controversy between CertainTeed and BIPV.

60. CertainTeed has adverse legal interests with respect to the threats made by BIPV against CertainTeed.

61. There exist antagonistic claims indicating sufficient immediacy, and imminent and inevitable litigation.

62. The interests of the Parties will be best served if this Court will enter a Declaratory Judgment setting forth the rights of the Parties with respect to this dispute.

63. The relief sought by CertainTeed will resolve the controversy relative to the respective interests of CertainTeed and BIPV.

64. CertainTeed seeks a Declaratory Judgment from this Court that CertainTeed did not (1) breach the 2010 Nondisclosure Agreement; the 2012 Nondisclosure Agreement; the Private Label Supply Agreement and any purchase orders issued thereunder; or the Covenant of Good Faith and Fair Dealing; (2) induce Defendant enter the 2010 Nondisclosure Agreement and/or 2012 Nondisclosure Agreement through fraud; (3) and/or misappropriate any alleged Trade Secrets of Defendant either pursuant to the Uniform Trade Secrets Act or the Common Law, and that CertainTeed be awarded its fees and costs.

## COUNT I
## DECLARATORY JUDGMENT

65.     CertainTeed incorporates by reference paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     CertainTeed did not breach the 2010 Nondisclosure Agreement.

67.     CertainTeed did not breach the 2012 Nondisclosure Agreement.

68.     CertainTeed did not Breach the 3000160722 Purchase Order.

69.     CertainTeed did not Breach any Covenant of Good Faith and Fair Dealing.

70.     CertainTeed did not fraudulently induce BIPV to enter the 2010 Nondisclosure Agreement.

71.     CertainTeed did not fraudulently induce BIPV to enter the 2012 Nondisclosure Agreement.

72.     CertainTeed did not misappropriate any Trade Secrets under the California Uniform Trade Secrets Act (or any other).

73.     CertainTeed did not misappropriate any Trade Secrets under the Common Law.

## COUNT II
## BREACH OF CONTRACT

74.     CertainTeed Corporation incorporates by reference paragraphs 1 through 73 of this Complaint as if fully set forth herein.

-14-

75.     Purchase Order 3000160722 and accompanying Terms and Conditions constitute a valid and binding contract.  Exhibit "F".

76.     BIPV breached its obligation under the Purchase Order by failing to provide products free from defect and/or that otherwise were suitable for their intended purpose for at least one (1) year.

77.     CertainTeed Corporation has fully complied with its obligations under the Purchase Agreement.

78.     As a result of Defendant's breach of the Purchase Order, CertainTeed Corporation has suffered damages in an amount to be proven at Trial.

## PRAYER FOR RELIEF

WHEREFORE, CertainTeed requests that this Court enter Judgment in its favor and against BIPV as follows:

a.     The Court enter Judgment that BIPV breached its obligations under Purchase Order Number 3000160722.

b.     The Court enter Judgment that CertainTeed: has not breached any of its Agreements with Defendant, including the Covenant of Good Faith and Fair Dealing; fraudulently induced Defendant to enter into any Agreement; misappropriated any Trade Secrets of Defendant; and has not violated any other Federal or State laws in relation to Defendant;

d.     The Court award CertainTeed its attorneys' fees  and costs in this action; and

e.     The Court enter an Order for such other and further relief as this Court deems just and proper.

Respectfully submitted,

M. Kelly Tillery
Noah S. Robbins
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103
(215) 981-4000

Attorneys for Plaintiffs
*CertainTeed Corporation, Saint-Gobain
Corporation, Husnu M. Kalkanoglu, Thomas M.
Smith, Robert E. Gardner, and Mark Stancroff*

Dated:  January 7, 2016

# EXHIBIT A

1  **ANDREW A. HARRIS** – CALIFORNIA SBN 216670
2  ANDY@ANDREWAHARRIS.COM
   WWW.ANDREWAHARRIS.COM
3  A MEMBER OF LAW OFFICES OF ANDREW A. HARRIS, A.P.C.
   970 East Main Street, Suite 202
4  Grass Valley, CA 95945
   (530) 271-2244
5  (530) 271-2246 Fax
6  Attorneys for BIPV, Inc.

7

8

9              UNITED STATES DISTRICT COURT

10            EASTERN DISTRICT OF CALIFORNIA

11

12 | BIPV, INC., a Nevada corporation,                | Case No.:
13 |              Plaintiff,                           |
14 |        v.                                         | COMPLAINT FOR MONEY DAMAGES AND INJUNCTIVE RELIEF FOR BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, FRAUD IN THE INDUCEMENT, AND MISAPPROPRIATION OF TRADE SECRETS
15 | CERTAINTEED CORPORATION, a Delaware
16 | corporation; CERTAINTEED CORPORATION ROOFING PRODUCTS GROUP aka
17 | CERTAINTEED ROOFING; SAINT-GOBAIN; HUSNU M. KALKANOGLU; THOMAS M.
18 | SMITH; RICHARD E. GARDINER;MARK STANCROFF;  DOES 1 through 100, inclusive, | DEMAND FOR JURY TRIAL
19 |
20 |              Defendant.                           |

21

22  Plaintiff BIPV, Inc. alleges:

23                    **THE PARTIES**

24       1.  Plaintiff BIPV, Inc. is a Nevada Corporation qualified to do business in California and

25  maintains its principal offices in Nevada County, California.

26       2.  Defendant CERTAINTEED CORPORATION is a Delaware corporation with its

27  headquarters in Pennsylvania. On information and belief, defendant CERTAINTEED

28  CORPORATION is a wholly owned subsidiary of defendant SAINT-GOBAIN.

3. Plaintiff is informed and believes and based thereon alleges that defendant SAINT-GOBAIN is an entity of an unknown kind domiciled in France as a "group of companies" and owns outright or owns a controlling interest in defendant CERTAINTEED CORPORATION.

4. Plaintiff is informed and believes and based thereon alleges that defendant CERTAINTEED CORPORATION ROOFING PRODUCTS GROUP, AKA CERTAINTEED ROOFING, is a wholly owned subsidiary of defendant CERTAINTEED CORPORATION, is domiciled in Pennsylvania and is an unknown form of entity.

5. At all times herein mentioned defendant Husnu Kalkanoglu was the Vice President of R&D for defendant CERTAINTEED ROOFING.

6. At all times herein mentioned defendant Thomas M. Smith was a Vice President of defendant CERTAINTEED CORPORATION.

7. At all times herein mentioned defendant Robert E. Gardiner was a Vice President of defendant CERTAINTEED CORPORATION.

8. At all times herein mentioned defendant Mark Stancroff was an officer of defendant CERTAINTEED CORPORATION.

9. Plaintiff is ignorant of the true names and capacities of defendants sued in this complaint as DOES 1 through 100, inclusive, and therefore sues these defendants by these fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff believes that each of the fictitiously named defendants is culpable for the acts and omissions alleged herein and is therefore liable for the damages suffered by plaintiff and for the relief sought in this action.

10. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, each of the defendants was the agent of each of the remaining defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and with the permission and consent of his/its codefendants.

///

///

## JURISDICTION AND VENUE

11.  Plaintiff is a corporation incorporated under the laws of Nevada with its principal place of business in California.

12.  Defendant CERTAINTEED CORPORATION (hereinafter referred to as "Certainteed") is incorporated under the laws of Delaware with its principal place of business in Pennsylvania.

13.  Defendant SAINT-GOBAIN is an entity of unknown type domiciled in France.

14.  On information and belief, defendant CERTAINTEED CORPORATION ROOFING PRODUCTS GROUP, AKA CERTAINTEED ROOFING, is a wholly owned subsidiary of defendant CERTAINTEED CORPORATION, is domiciled in Pennsylvania and is an unknown form of entity.

15.  On information and belief, defendant Husnu Kalkanoglu is an individual residing in Pennsylvania.

16.  On information and belief, defendant Thomas M. Smith is an individual residing in Pennsylvania.

17.  On information and belief, defendant Robert E. Gardiner is an individual residing in Pennsylvania.

18.  On information and belief, defendant Mark Stancroff is an individual residing in Pennsylvania.

19.  On information and belief, the defendants named fictitiously herein are citizens of a state other than California and Nevada or are corporations or other entities incorporated or formed and domiciled in a state other than California and Nevada and/or are domiciled outside of the United States of America.

20.  The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 USC § 1332.

21.  Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this District.

/ / /

## FACTS FORMING BASIS FOR CLAIMS

22.   Plaintiff is a small privately funded company formed in 2008 to design, develop and commercialize innovative building integrated solar generating products.  At the 2010 Solar Power International Show in Los Angeles, plaintiff displayed its new products that were certified for sale and being test marketed to roofing and solar distribution channels.

23.   At the 2010 Solar Power International Show in Los Angeles, two executives of defendant CERTAINTEED CORPORATION (hereinafter "CertainTeed"), Husnu M. Kalkanoglu and Mark C. Stancroft, approached plaintiff's chief executive officer, Ron Gangemi, and informed him the products on display were exactly what Certainteed was looking for to add to Certainteed's product line due to the huge market potential and the substantial development time and expense that would be saved by Certainteed acquiring rights to plaintiff's products.

24.   In October 2010, plaintiff and defendant Husnu M. Kalkanoglu on behalf of defendant CERTAINTEED ROOFING entered into a *Nondisclosure Agreement*, dated October 28, 2010, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated herein by reference.

25.   In November 2010, Mr. Gangemi on behalf of plaintiff met with employees, executives and officers of Certainteed at its headquarters in Pennsylvania to exchange information and explore opportunities for collaboration between plaintiff and Certainteed through a manufacturing, marketing and sales alliance.  Mr. Gangemi on behalf of plaintiff made it clear at the meeting that plaintiff was seeking a partner to take full responsibility for manufacturing and distributing plaintiff's products under an agreement for sale or license of plaintiff's product rights.  The meeting concluded with an agreement between plaintiff and defendant CertainTeed Roofing pursuant to which plaintiff would send its products to Certainteed for evaluation and provide information necessary to qualify the products for sale and marketing through CertainTeed's distribution system under a purchase agreement or license agreement between plaintiff and Certainteed.

26.   Following the November 2010 meeting, Certainteed engaged in extensive evaluation and testing of plaintiff's products.  Plaintiff provided Certainteed with detailed trade secrets and other of plaintiff's proprietary information, including without limitation: (a) the CSA certification process and testing relative to plaintiff's products; (b) product drawings; (c) product manuals; (d) vendors;

(e) product assembly process; (f) material specifications; (g) the testing of plaintiff's products for CSA certification; (h) product testing using Certainteed and other underlayment products; (i) product and market evaluations; and (j) all of plaintiff's product designs, documentation, testing and certifications.

27.  CertainTeed approved plaintiff's products and, consequently, on August 23, 2011, plaintiff and CertainTeed entered into a *Private Label Supply Agreement* (executed by defendant Thomas M. Smith as Vice President of CertainTeed), a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by reference.  Following the execution of the *Private Label Supply Agreement*, Certainteed issued a press release, a true and correct copy of which is attached hereto as Exhibit 3 and incorporated herein by reference, touting its new "Apollo Solar Roofing System", which incorporated plaintiff's products and trade secrets.

28.  CertainTeed  did not place immediate orders for plaintiff's products in quantities sufficient to launch  CertainTeed's "Apollo Solar Roofing System"  or meet the agreed market projections.  According to CertainTeed, it preferred to wait until after the Christmas and New Year holidays to do so.  In the meantime, plaintiff allocated virtually all of its staff and resources to fulfill CertainTeed's requests for further very detailed proprietary information and product development and refinement requests and, therefore, plaintiff did not pursue other potential major distribution channels and sales opportunities.

29.  On January 6, 2012, plaintiff and defendant CertainTeed, by and through defendant Robert E. Gardiner as Vice President of Marketing for Certainteed, entered into a second confidentiality agreement in the form of a letter, a true and correct copy of which is attached hereto as Exhibit 4, for purposes of plaintiff providing Certainteed with "Evaluation Material".  Thereafter, plaintiff provided Certainteed with the "Evaluation Material" consisting of plaintiff's trade secrets and other proprietary information consisting of, among other things, information on plaintiff's pending patents, other intellectual property in development, IMS product and nano-inverter, new products and proposed modifications on existing products, existing list of customers and information on potential customers, existing contracts, sales, margin and income information, vendor list,

manufacturing assets, expansion plans and details, suppliers and related agreements, corporate structure, and detailed financial information.

30. Thereafter, the parties had verbal and written/electronic communications, evaluated vendors, and on January 18, 2012, met at plaintiff's facility in Nevada County and agreed in principle to terms of a proposed agreement pursuant to which Certainteed would (a) purchase certain of plaintiff's assets for One Million Dollars, (b) pay guaranteed royalties to plaintiff of One Million Dollars per year for four years against ten percent of the gross sales of the products, and (c) in year five and thereafter pay (without guaranty) royalties to plaintiff of two percent of gross sales. Plaintiff was told the agreement was "subject to approval by Certainteed's parent [defendant] Saint-Gobain".

31. While approval of the agreement by Certainteed's parent company, defendant Saint-Gobain, was in progress, Certainteed approved the specifications for plaintiff's products and in particular plaintiff's PV mounting design, and issued Purchase Order No. 3000160722 for $1,648,608 of plaintiff's products, a true and correct copy of which is attached hereto as Exhibit 5 and incorporated herein by reference, pursuant to the *Private Label Supply Agreement* (Exhibit 2). Plaintiff confirmed Certainteed's purchase order with three *Sales Acknowledgments*, true and correct copies of which are attached hereto as Exhibit 6 and incorporated herein by reference.

32. In or about March 2012, plaintiff began fulfilling the Purchase Order (Exhibit 5). In September 2012, Certainteed advised plaintiff that the "integrated PV product" had failed on certain installations. Plaintiff investigated the alleged failures, internally and with the help of independent experts, and determined that the failures resulted from erroneous installation of the products and not as a result of any defect in plaintiff's products. Plaintiff informed CertainTeed of the same.

33. By letter dated March 15, 2013, plaintiff requested shipping instructions from Certainteed for at least 2,000 units of products pursuant to the Purchase Order (Exhibit 5). By letter dated April 26, 2013, Certainteed canceled the Purchase Order (Exhibit 5) and Private Label Supply Agreement (Exhibit 2).

34. In February 2013, Certainteed announced its new "Apollo II" products. Plaintiff obtained a sample of the Apollo II products in March 2013 and discovered that the designs of plaintiff's products and Certainteed's Apollo II products are interchangeable, and plaintiff then concluded that

Certainteed misappropriated and is profiting from plaintiff's Confidential Information, Evaluation Materials, trade secrets and other proprietary information of plaintiff, to wit:

    (a) PV laminate design and power circuit to maximize performance;

    (b) Dual wire holders;

    (c) J Box wire restraint;

    (d) PV shingle drain lip;

    (e) Panel wiring design;

    (f) Method of gluing PV laminate to shingle mount;

    (g) Installation instructions;

    (h) Panel mounting to roof standoffs for uneven roofs and wiring; and

    (i) PV Frame Mount Polymer.

35. Plaintiff wrote to Certainteed on two occasions demanding that Certainteed pay damages of $650,000 to plaintiff for actual losses and lost profit resulting from wrongful cancellation of the purchase order, payment of $2,250,000 for use of plaintiff's Confidential Information, Evaluation Materials, trade secrets and other proprietary information of plaintiff through May 15, 2013, and asserting that plaintiff does not consent to Certainteed's use of plaintiff's Confidential Information, Evaluation Materials, trade secrets and other proprietary information of plaintiff.

36. Certainteed has yet to engage in meaningful negotiations to resolve the foregoing dispute.

## FIRST CLAIM FOR BREACH OF CONTRACT
## (2010 NONDISCLOSURE AGREEMENT)

37. Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, inclusive, of this complaint and realleges the same herein as though fully set forth.

38. On or about October 28, 2010, by e-mail exchange between plaintiff's offices in Grass Valley, Nevada County, California, and CertainTeed's offices in an unknown location outside of California, plaintiff and Certainteed (by and through defendant Husnu M. Kalkanoglu) entered into a written Nondisclosure Agreement (Exhibit 1).

39. Plaintiff performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Nondisclosure Agreement (Exhibit 1).

40.  In or about March 2013, defendants, and each of them, breached the Nondisclosure Agreement (Exhibit 1) by using plaintiff's "Confidential Information" (as defined in paragraph 1 of the Nondisclosure Agreement, Exhibit 1) for purposes outside the "Project" (as defined in Paragraph 1 of the Nondisclosure Agreement, Exhibit 1), to wit: Defendants, and in each of them, and in particular Certainteed, used plaintiff's Confidential Information to develop, market and sell its own products for the purpose of reaping and keeping enormous profits thereby depriving plaintiff of the value and use of plaintiff's Confidential Information either in the form of payment for the purchase or royalties for use of plaintiff's Confidential Information and further it deprived plaintiff of taking the Confidential Information to a third party whereby plaintiff would be paid for its Confidential Information.

41. As a result of defendants' breach of the contract, plaintiff has suffered damages for lost profits, lost opportunities, actual damages, and consequential damages, all in the sum of $20,000,000 or in such other sum according to proof.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### SECOND CLAIM FOR BREACH OF CONTRACT
### (2012 NONDISCLOSURE AGREEMENT)

42.  Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, and 38 through 41, inclusive, of this complaint and realleges the same herein as though fully set forth.

43.  On or about January 6, 2012, by e-mail exchange in which plaintiff's execution occurred in Grass Valley, Nevada County, California, and Certainteed's execution occurred in an unknown location outside of California, plaintiff and Certainteed (by and through defendant Robert E. Gardiner) entered into a written nondisclosure agreement letter a copy of which is attached as Exhibit 4 and made a part of this pleading.

44. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the nondisclosure agreement letter (Exhibit 4).

45. In or about March 2013, defendants, and each of them, breached the nondisclosure agreement letter (Exhibit 4) by using plaintiff's "Evaluation Material" (as defined in paragraph 1 of the nondisclosure agreement letter) for purposes other than, as set forth in paragraph 2 of the nondisclosure agreement letter (Exhibit 4), "evaluating a possible transaction between [plaintiff] and [Certainteed or one of Certainteed's affiliates]", to wit: Defendants, and each of them, and in particular defendant Certainteed, used plaintiff's Evaluation Material to develop and market products for the purpose of reaping and keeping enormous profits thereby depriving plaintiff of the value and use of plaintiff's Confidential Information either in the form of payment for the purchase or royalties for use of plaintiff's Confidential Information and further it deprived plaintiff of taking the Confidential Information to a third party whereby plaintiff would be paid for its Confidential Information.

46. As a result of defendants' breach of the contract, plaintiff has suffered damages for lost profits, lost opportunities, actual damages, and consequential damages, all in the sum of $20,000,000 or in such other sum according to proof.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### THIRD CLAIM FOR BREACH OF CONTRACT
### (PURCHASE ORDER)

47. Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41, and 43 through 46, inclusive, of this complaint and realleges the same herein as though fully set forth.

48. On or about January 31, 2012, CertainTeed issued Purchase Order 3000160722 (Exhibit 5) to plaintiff for products that were previously tested, certified, approved and privately labeled for sale by CertainTeed. The Purchase order was transmitted by CertainTeed by e-mail to Plaintiff's office in Grass Valley, California. The Purchase Order was confirmed on March 7, 2012, by plaintiff through the transmission of Sales Acknowledgments (Exhibit 6), which were sent by plaintiff by e-mail from its Grass Valley, California offices and addressed to CertainTeed in Southeastern, Pennsylvania.

49. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Purchase Order (Exhibit 5) and Sales Acknowledgments (Exhibit 6).

50. On October 12, 2012, Certainteed sent a letter to plaintiff alleging defects in plaintiff's products. Thereafter, the parties exchanged further written and verbal communications addressing the alleged defects. In those communications, plaintiff informed Certainteed that the alleged events resulted not from product defects but were caused by faulty installation and not by any fault of plaintiff.

51. By letter dated April 26, 2013, CertainTeed unilaterally, wrongfully and without lawful justification canceled the Purchase Order (Exhibit 5) and thereby breached the Purchase Order (Exhibit 5).

52. As a result of defendants' breach of the contract, plaintiff has suffered damages of lost profits of $500,000 and consequential damages of $150,000 or in such other sums according to proof.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

**FOURTH CLAIM FOR BREACH OF**

**THE COVENANT OF GOOD FAITH AND FAIR DEALING**

**(NONDISCLOSURE AGREEMENTS)**

53. Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41, 43 through 46, and 48 through 52, inclusive, of this complaint and realleges the same herein as though fully set forth.

54. By using plaintiff's Confidential Information and Evaluation Materials in breach of the 2010 Nondisclosure Agreement (Exhibit 1) and the 2012 nondisclosure letter agreement (Exhibit 4) for their own financial gain, defendants, and each of them, breached the covenant of good faith and fair dealing implied by California law in the Nondisclosure Agreement (Exhibit 1) and the nondisclosure agreement letter (Exhibit 4). In particular, defendant Certainteed went to market with products using plaintiff's Confidential Information, Evaluation Materials, trade secrets and other proprietary information thereby reaping and keeping enormous profits and unfairly interfering with

plaintiff's right to receive the benefits of the Private Label Supply Agreement, the Purchase order, and plaintiff's use of its Confidential Information, Evaluation Materials, trade secrets and other proprietary information to pursue other means to bring its technology, ideas and products to market for a profit.

55.   As a result of the breach of the covenant of good faith and fair dealing implied in the 2010 Nondisclosure Agreement (Exhibit 1) and 2012 nondisclosure letter agreement (Exhibit 4), plaintiff has suffered damages exceeding $20,000,000 or in such other sum according to proof.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

## FIFTH CLAIM FOR FRAUD IN THE INDUCEMENT
## (2010 NONDISCLOSURE AGREEMENT)

56.   Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41, 43 through 46, 48 through 52, and 54 through 55, inclusive, of this complaint and realleges the same herein as though fully set forth.

57.   Pursuant to the 2010 Nondisclosure Agreement (Exhibit 1), defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, promised and covenanted to use "Confidential Information" (defined in paragraph 1 of the Nondisclosure Agreement, Exhibit 1) disclosed by plaintiff for purposes of the "Project" (defined in paragraph 1 under the heading "BACKGROUND" in the Nondisclosure Agreement, Exhibit 1) with the intention of inducing plaintiff to provide them with plaintiff's Confidential Information solely for purposes of the project. The foregoing promises and covenants were false in that defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, used the Confidential Information disclosed by plaintiff to enable Certainteed to market, manufacture and sell products to detriment of plaintiff.

58.   At the time the Nondisclosure Agreement (Exhibit 1) was executed, defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, had no intention of fulfilling the promises and covenants therein, and in particular using plaintiff's Confidential Information solely for the Project, and in fact, as evidenced by the conduct alleged herein, intended to use plaintiff's

Confidential Information to manufacture and sell Certainteed products using plaintiff's Confidential Information for defendants' gain and to plaintiff's detriment.

59. Plaintiff was ignorant of the foregoing intention of defendants Husnu M. Kalkanoglu, Mark Stancroff, and CertainTeed. Plaintiff relied on the promises and covenants in the Nondisclosure Agreement (Exhibit 1) and provided plaintiff's Confidential Information to defendants. Plaintiff relied on the promises and covenants in the Nondisclosure Agreement (Exhibit 1) and was misled by the same, and by defendants Husnu M. Kalkanoglu, Mark Stancroff, and CertainTeed, and each of them, in that plaintiff believed that plaintiff was disclosing its Confidential Information solely for the "Project" and for no other purpose and did not believe or have reason to believe defendants would use plaintiff's Confidential Information for a purpose other than the "Project."

60. If plaintiff had known defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, true intention, which was to use plaintiff's Confidential Information to market and sell products without payment of any kind to plaintiff, plaintiff would never have disclosed its Confidential Information to defendants.

61. Defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, concealed from plaintiff they had wrongfully used and appropriated plaintiff's Confidential Information and plaintiff did not discover defendants had used plaintiff's Confidential Information until March 2013.

62. As a proximate result of the fraudulent conduct of the defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, as herein alleged, plaintiff was induced to provide its Confidential Information to defendants, which said defendants used to bring products to market for substantial profit, by reason of which the plaintiff has suffered general damages in the sum of $20,000,000 and special damages for future lost profits and royalties of $24,000,000, or in such other sums according to proof.

63. The aforementioned conduct of the defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and each of them, was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendants Husnu M. Kalkanoglu, Mark Stancroff and Certainteed, and

1    each of them, with the intention on the part of the defendants of thereby depriving the plaintiff of

2    property or legal rights or otherwise causing injury, and was despicable conduct that subjected the

3    plaintiff to a cruel and unjust hardship in conscious disregard of the plaintiff's rights, so as to justify

4    an award of exemplary and punitive damages in an amount equal to two times the actual damages

5    suffered by plaintiff in the sum of $40,000,000 or according to proof, whichever is greater.

6         WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth

7    below.

## SIXTH CLAIM FOR FRAUD IN THE INDUCEMENT

## (2012 NONDISCLOSURE AGREEMENT)

10        64.  Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41,

11   43 through 46, 48 through 52, 54 through 55, and 57 through 63, inclusive, of this complaint and

12   realleges the same herein as though fully set forth.

13        65.  Pursuant to the 2012 nondisclosure agreement letter (Exhibit 4), defendant Robert E.

14   Gardiner and defendant Certainteed Corporation, Roofing Products Group promised and covenanted

15   to use "Evaluation Material" (defined in paragraph 1 of the nondisclosure agreement letter, Exhibit 4)

16   disclosed by plaintiff "solely for the purpose of evaluating a possible transaction between [plaintiff]

17   and us or one of our affiliates" with the intention of inducing plaintiff to provide them with plaintiff's

18   Evaluation Material solely for the stated purpose.  The foregoing promises and covenants were false

19   in that defendant Robert E. Gardiner and defendant Certainteed Corporation, Roofing Products

20   Group, and all defendants, used the Evaluation Material disclosed by plaintiff to enable Certainteed

21   to market, manufacture and sell products to the exclusion of plaintiff.

22        66.  At the time the nondisclosure agreement letter (Exhibit 4) was executed, defendant

23   Robert E. Gardiner and defendant Certainteed Corporation Roofing Products Group, and all

24   defendants, had no intention of fulfilling the promises and covenants therein, and in particular using

25   plaintiff's Evaluation Material solely for the stated purpose and in fact intended to use plaintiff's

26   Evaluation Material to manufacture and sell Certainteed products using plaintiff's Evaluation

27   material for defendants' gain and to plaintiff's detriment.

28

67. Plaintiff was ignorant of the foregoing intention of defendant Robert E. Gardiner and defendant Certainteed Corporation Roofing Products Group.  Plaintiff relied on the promises and covenants in the nondisclosure agreement letter (Exhibit 4) and provided plaintiff's Evaluation material to defendants.  Plaintiff relied on the promises and covenants in the nondisclosure agreement letter (Exhibit 4) and was misled by those same promises and covenants in that plaintiff believed that plaintiff was disclosing its Evaluation Material solely for the stated purpose and for no other purpose and did not believe or have reason to believe defendants would use plaintiff's Evaluation Material for a purpose other than the stated purpose.  If plaintiff had known defendants' true intention, which was that defendants would use the Evaluation Material to bring products to market for sale without paying plaintiff, plaintiff would never have disclosed its Evaluation Material to defendants.

68.  Defendants concealed from plaintiff they had wrongfully used and appropriated plaintiff's Evaluation Material and plaintiff did not discover defendants had used plaintiff's Evaluation Material until March 2013.

69.  As a proximate result of the fraudulent conduct of the defendants as herein alleged, plaintiff was induced to provide its Evaluation Material to defendants, which defendants used to bring products to market for substantial profit, by reason of which the plaintiff has suffered general damages in the sum of $20,000,000, and special damages for future lost profits and royalties of $24,000,000, or in such other sums according to proof.

70.  The aforementioned conduct of the defendants, and in particular defendant Robert E. Gardiner and defendant CertainTeed Corporation Roofing Products Group, and each of them, was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendants with the intention on the part of the defendants of thereby depriving the plaintiff of property or legal rights or otherwise causing injury, and was despicable conduct that subjected the plaintiff to a cruel and unjust hardship in conscious disregard of the plaintiff's rights, so as to justify an award of exemplary and punitive damages in an amount equal to two times the actual damages suffered by plaintiff in the sum of $40,000,000 or according to proof, whichever is greater.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

**SEVENTH CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS**

**(California Uniform Trade Secrets Act)**

71.  Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41, 43 through 46, 48 through 52, 54 through 55, 57 through 63, and 65 through 70, inclusive, of this complaint and realleges the same herein as though fully set forth.

72. At all times mentioned herein, plaintiff was the owner of and in possession of trade secrets consisting of (a) plaintiff's process for obtaining CSA certification of plaintiff's products; (b) product drawings; (c) product manuals; (d) vendors; (e) product assembly process; (f) material specifications; (g) plaintiff's process for CSA testing of plaintiff's products; (h) product testing using Certainteed and other underlayment products; (i) product and market evaluations; (j) all of plaintiff's product designs, documentation, testing and certifications; and in particular (k) PV laminate design and power circuit to maximize performance, (l) Dual wire holders, (m) J Box wire restraint, (n) PV shingle drain lip, (o) Panel wiring design, (p) Method of gluing PV laminate to shingle mount, (q) Installation instructions, (r) Panel mounting to roof standoffs for uneven roofs and wiring, and (s) PV Frame Mount Polymer.

73.  Plaintiff's trade secrets set forth in paragraph 72 of this complaint had economic value in that its use resulted in viable solar roofing products that when marketed and sold would result in substantial profits.  Plaintiff made reasonable efforts to insure that the trade secrets set forth in paragraph 72 of this complaint remained a secret by disclosing them only to key employees of plaintiff, not disclosing them to third parties, and by entering into nondisclosure agreements with potential business partners, including defendants.

74.  Beginning in March 2013 and continuing to the present time, defendants, and each of them, misappropriated plaintiff's trade secrets by using plaintiff's trade secrets without the express or implied consent of plaintiff, and sold products using plaintiff's trade secrets without plaintiff's consent for defendants' profit and depriving plaintiff of the value of the use of its trade secrets and further depriving plaintiff of compensation for use of the trade secrets including royalties.

75.  As a proximate result of the defendants' use of plaintiff's trade secrets set forth in paragraph 72 of this complaint, plaintiff has suffered actual damages of $20,000,000 or such other

sum according to proof. As a further proximate result of the misappropriation, defendants, and each of them, were unjustly enriched by selling products using plaintiff's trade secrets without paying plaintiff for such use in the sum of $43,000,000 or according to proof.

76. Plaintiff is informed and believes and thereon alleges that the aforementioned acts of the defendants, and each of them, were willful and malicious in that defendants fraudulently induced plaintiff to disclose its Confidential Information and Evaluation Materials for purposes of entering into an agreement whereby plaintiff would receive royalties from defendants for the use of plaintiff's trade secrets in products sold by defendants with the deliberate intent to injure plaintiff's business and reap and keep enormous profits to the detriment of plaintiff. Plaintiff is therefore entitled to punitive damages in the amount of $40,000,000 or in such other amount as will punish and deter defendants from similar conduct in the future. Plaintiff is also entitled to reasonable attorney's fees according to proof.

77. Defendants' wrongful conduct in misappropriating plaintiff's trade secrets, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to plaintiff's business in that plaintiff has been unable to use the trade secrets to enter into agreements with other businesses to bring products to market using plaintiff's trade secrets and thereby compete with defendants' products, and as a result plaintiff is operating at such a loss that it may be forced out of business before this action can be brought to trial.

78. Plaintiff has no adequate remedy at law for the injuries currently being suffered in that defendant is continuing to sell products using misappropriated trade secrets of plaintiff and plaintiff would be required to maintain a multiplicity of judicial proceedings to protect its interests.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

## EIGHTH CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS
### (Common Law)

79. Plaintiff incorporates the allegations set forth in paragraphs 22 through 36, 38 through 41, 43 through 46, 48 through 52, 54 through 55, 57 through 63, 65 through 70, and 72 through 78, inclusive, of this complaint and realleges the same herein as though fully set forth.

80.  In or about March 2013 and continuing to the present, defendants misappropriated plaintiff's trade secrets set forth in paragraph 72 of this complaint by using plaintiff's trade secrets to make products sold by Certainteed after inducing plaintiff to disclose its Confidential Information and Evaluation Materials to defendants for purposes of entering into an agreement whereby plaintiff would sell and/or license its trade secrets to defendants in exchange for royalties.

81.  As a result of defendants' misappropriation of plaintiff's trade secrets and use of the same to manufacture and sell products, plaintiff has suffered actual damages in the nature of lost profits on the sales of defendants' products and lost profits on licensing the trade secrets to a third party for purposes of generating profits in the amount of $20,000,000 or in such other sum according to proof.

82.  Plaintiff is informed and believes and thereon alleges that the aforementioned acts of the defendants, and each of them, were willful and malicious in that defendants fraudulently induced plaintiff to disclose its Confidential Information and Evaluation Materials for purposes of entering into an agreement whereby plaintiff would receive royalties from defendants for the use of plaintiff's trade secrets in products sold by defendants with the deliberate intent to injure plaintiff's business and reap and keep enormous profits to the detriment of plaintiff. Plaintiff is therefore entitled to punitive damages in the amount of $40,000,000, or in such other amount sufficient to punish and deter defendants from similar conduct.

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as set forth below.

### PRAYER

WHEREFORE, plaintiff prays judgment against defendants, and each of them according to proof, as follows:

On the First Claim:

1.  Compensatory damages in the sum of $20,000,000 or in some other sum according to proof;

2.  Interest at the legal rate from March 2013 to the date of judgment according to proof;

On the Second Claim:

1.  Compensatory damages in the sum of $20,000,000 or in some other sum according to proof;

2.  Interest at the legal rate from March 2013 to the date of judgment according to proof;

On the Third Claim:

1. Lost profits of $500,000 or in such other sum according to proof;

2. Consequential damages of $150,000 or in such other sum according to proof;

3. Interest at the legal rate from March 2013 to the date of judgment according to proof;

On the Fourth Claim:

1. Compensatory damages in the sum of $20,000,000 or in some other sum according to proof;

2. Interest at the legal rate from March 2013 to the date of judgment according to proof;

On the Fifth Claim:

1. For general damages in the sum of $20,000,000 or in some other sum according to proof;

2. For special damages for in the sum of $24,000,000 or in some other sum according to proof;

3. For punitive damages in the amount of $40,000,000 or such other amount sufficient and appropriate to punish the defendants and deter others from engaging in similar misconduct;

On the Sixth Claim:

1. For general damages in the sum of $$20,000,000 or in some other sum according to proof;

2. For special damages for in the sum of $24,000,000 or in some other sum according to proof;

3. For punitive damages in the amount of $40,000,000 or such other amount sufficient and appropriate to punish the defendants and deter others from engaging in similar misconduct;

On the Seventh Claim:

1. For an order requiring defendants to show cause, if any they have, why they should not be enjoined as hereinafter set forth during the pendency of this action;

2. For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants and each of them, and their agents, affiliates, subsidiaries, partners, venturers, vendors, and contractors from disclosing, using, or selling products using plaintiff BIPV, Inc.'s trade secrets as set forth in paragraph 72 of this complaint, along with all Confidential Information and Evaluation Material provided to defendants by plaintiff BIPV, Inc. and requiring defendants to return to plaintiff BIPV, Inc. all documents and other tangible materials embodying and/or memorializing all of plaintiff BIPV, Inc.'s trade secrets or confidential and proprietary information;

3. For general damages of $20,000,000

4. For disgorgement or an award of damages in the amount of $43,000,000, or such other sum according to proof and the amount necessary to prevent the unjust enrichment of defendants;

5. For reasonable attorney's fees according to proof;

6. For punitive damages in the amount of $40,000,000 or such other amount sufficient and appropriate to punish the defendants and deter others from engaging in similar misconduct;

On the Eighth Claim:

1. For general damages of $20,000,000 or such other sum according to proof;

2. For punitive damages in the amount of $40,000,000 or such other amount sufficient and appropriate to punish the defendants and deter others from engaging in similar misconduct;

On all Claims:

1. For all costs of suit herein incurred; and

2. For such other and further relief as the court may deem proper.

Dated:                                                    LAW OFFICES OF ANDREW A. HARRIS, A.P.C.


                                            By: _____
                                                    Andrew A. Harris

                                                    Attorneys for BIPV, Inc.


**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.


Dated:                                                    LAW OFFICES OF ANDREW A. HARRIS, A.P.C.


                                            By: _____
                                                    Andrew A. Harris

                                                    Attorneys for BIPV, Inc.

# EXHIBIT B

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 12/456,079 | 06/10/2009 | Ronald J. Gangemi | 09020.101 |

CONFIRMATION NO. 8542

41689
BRADLEY P. HEISLER
HEISLER & ASSOCIATES
3017 DOUGLAS BOULEVARD, SUTIE 300
ROSEVILLE, CA 95661

**PUBLICATION NOTICE**

*OC000000044989244*

**Title:** Roof mounting bracket for photovoltaic power generation system
**Publication No.** US-2010-0313499-A1
**Publication Date:** 12/16/2010

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

# EXHIBIT C

# NONDISCLOSURE AGREEMENT

This NONDISCLOSURE AGREEMENT, dated as of October 28, 2010, is between CertainTeed Corporation, having its principal place of business at 750 East Swedesford Rd. Valley Forge, PA 19482 ("CertainTeed"), and Connect by Computer, LLC, dba Sun Energy Engineering Company and BIPV, Inc. a Nevada Corporation, together with their respective successors and assigns (collectively "BIPV, Inc."), having a place of business at 908 Taylorville Road, Suite 203, Grass Valley, CA  95949.

## BACKGROUND

1.      CertainTeed, and BIPV, Inc. plan to enter into discussions regarding a potential business relationship concerning "Roof Integrated Photovoltaic Products and Associated Components and Accessories and Development Thereof" (the "Project"); and;

2.      In the course of discussions between the parties relating to the Project, each party has disclosed or may disclose to the other party certain of its proprietary know-how and other confidential information; and

3.      Each of the parties hereto wishes to ensure that all such proprietary know-how and confidential information is treated in a strictly confidential manner by the party receiving such information.

## TERMS

NOW THEREFORE, in consideration of the premises and covenants contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      <u>Confidential Information</u>.  Each party acknowledges that the other party has developed and is the exclusive owner of a substantial body of proprietary know-how, and other confidential information relating to its business, including, without limitation, information regarding customers, suppliers and business arrangements, technical and business data, know-how, processes, designs and ideas (collectively, "Confidential Information").  In addition, Confidential Information shall include, without limitation, information relating to the Project, including the details thereof and the fact that the Project is under consideration.

2.      <u>Nondisclosure</u>.  Except with the prior written consent of the disclosing party or as specifically provided herein, the recipient of the disclosing party's Confidential Information (hereinafter, "Recipient") shall not, and shall direct its affiliates and their respective directors, officers, employees, agents, and other representatives (collectively, "representatives"), not to disclose or permit the disclosure to any third party of any Confidential Information disclosed to it by the disclosing party or such disclosing party's affiliates or representatives.  For purposes of this Agreement, a party's "affiliates" shall include any entity that controls, is controlled by, or is under common control with such party, and a party's "representatives" shall include the representatives of its affiliates.

3.      <u>Form of Disclosures</u>.  To the extent practical, Confidential Information shall be disclosed in documentary or tangible form marked "Proprietary" or "Confidential."  In the case of disclosures made orally, by visual inspection, or in electronic form, the disclosing party shall have

the right or, if requested by Recipient, the obligation, to confirm in writing within thirty (30) days after the disclosure is made, the nature of the disclosure and whether such disclosure contained Confidential Information intended to be protected by this Agreement.

4.    <u>Restricted Use of Confidential Information</u>.  Recipient, and its affiliates and representatives, shall use any Confidential Information disclosed to it or them solely for the purposes of the Project.  Recipient shall limit the dissemination of any Confidential Information to those of its affiliates and their respective representatives who need to know such information and who are informed of their obligation to maintain the confidential nature of such information and to use such information solely for purposes of the Project.  Recipient agrees to be responsible for any breach of this Agreement by its affiliates or representatives.

5.    <u>Permitted Exceptions</u>.  Recipient shall be under no obligation with respect to any Confidential Information of the other party that: (a) is or becomes generally available to the public other than as a result of a breach of this Agreement by the Recipient or any of its affiliates or representatives; (b) is known to Recipient or any of its affiliates or representatives at the time of disclosure; (c) was received by Recipient or any of its affiliates or representatives after the time of disclosure hereunder on a non-confidential basis from a third party who had a legal right to make such disclosure; or (d) is subsequently developed by Recipient or any of its affiliates without the use of such Confidential Information.

6.    <u>No Grant of License</u>.  Nothing in this Agreement shall be construed as granting or implying any right or license to use any Confidential Information disclosed hereunder except for purposes of the Project, and all Confidential Information disclosed or otherwise acquired by Recipient shall remain the property of the disclosing party.

7.    <u>Return of Information</u>.  Upon the discontinuance of discussions between the parties relating to the Project, or upon the request of the disclosing party, Recipient shall immediately return all written or other tangible materials that contain or refer to the disclosing party's Confidential Information that were made available or supplied to Recipient by the disclosing party (including all copies and reproductions of such materials).  Any materials prepared by Recipient or any of its affiliates or representatives that contain references to the Confidential Information shall be destroyed, and such destruction shall be certified in writing to the disclosing party by an authorized representative of Recipient who has supervised the destruction.

8.    <u>Test Materials and Samples</u>.  All test materials and samples furnished by the disclosing party shall remain the property of the disclosing party.  Recipient shall perform or have performed only those tests and experiments on the materials and samples, which the disclosing party may agree to in advance in writing.  Recipient shall not allow the test materials or samples to be examined, tested or analyzed by a third party without the prior written consent of the disclosing party.  All test and performance results shall become the property of the disclosing party and shall be Confidential Information subject to the terms of this Agreement.

9.    <u>Disclosure Required by Law</u>.  In the event that Recipient becomes legally compelled (by interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, Recipient agrees to provide the disclosing party with prompt notice of such request(s) so that it may seek an appropriate protective order or other appropriate remedy and/or waive Recipient's compliance with the provisions of this Agreement.  If the disclosing party has not obtained a protective order or other remedy within a reasonable period of time after notice by Recipient, or if the disclosing party waives compliance with the provisions of this Agreement, Recipient agrees to furnish only that

portion of the Confidential Information that, in the reasonable opinion of Recipient's counsel, is legally required to be furnished.

10.    Relationship of Parties:  It is not the intention of the parties to this Agreement to create, nor shall this Agreement be construed as creating, any joint venture, partnership or agency relationship between the parties so as to render either party liable to the other party for anything more than the performance of its respective obligations hereunder.  The parties agree that unless a definitive agreement between them with respect to the Project has been executed and delivered, neither party will be under any legal obligation of any kind whatsoever with respect to the Project by virtue of this Agreement or any other written or oral expression with respect to the Project by its respective affiliates or representatives, except as specifically provided herein.

11.    Equitable Relief.  Recipient acknowledges that its unauthorized disclosure or use of the disclosing party's Confidential Information will have a material adverse effect on the disclosing party for which damages may be difficult to ascertain.  Recipient therefore agrees that in addition to and not in lieu of any other rights or remedies the disclosing party may have, the disclosing party may be entitled to equitable relief, including injunctive relief and specific performance, in the event of any breach of this Agreement.

12.    Other Remedies.  Each party retains all rights and remedies afforded it under the patent and other statutory laws of any relevant jurisdiction and of the common law, including without limitation any laws designed to protect proprietary or confidential information.

13.    No Assignment.  Recipient shall not assign any of its rights or obligations hereunder, and any such purported assignment shall be null and void.

14.    Notices.  All notices or communications required or permitted under this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, or by telecopier or recognized overnight carrier, to the intended recipient at the address and attention designated in the Agreement or to such other address or attention as the recipient may have designated in writing.  Any such notice or communication shall be deemed delivered as follows:  if hand delivered, on the day so delivered; if mailed, three business days after the date so mailed; if telecopied, upon written confirmation by the sending machine of effective transmission or upon telephone confirmation of receipt (provided that a confirming copy is sent by recognized overnight courier); and if sent by recognized overnight carrier, the next business day.

15.    No Waiver.  No waiver of any provision, breach or default under this Agreement shall be deemed a waiver of any subsequent provision, breach or default, nor shall any such waiver constitute a continuing waiver.

16.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

17.    Entire Agreement; Amendments.   This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements or understandings, whether written or oral.  This Agreement may not be amended, supplemented or rescinded except by a written instrument duly executed by each of the parties hereto.

18.     <u>Term and Termination</u>.  The term of this agreement shall be two (2) years from the date first written above.  Either party may terminate discussions relating to the Project and this Agreement at any time upon written notice to the other party, provided that Recipient's obligations hereunder with respect to Confidential Information disclosed prior to any such termination shall continue for five (5) years following such termination date.

19.     <u>Execution</u>.  This Agreement shall be executed in duplicate and shall be effective as of the date first written above.

20.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  This Agreement shall become binding only when each party has executed and delivered to the other party hereto one or more counterparts.

21.     **<u>Governing Law</u>.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of law.**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate as of the date first written above.

**CERTAIN TEED CORPORATION**

Signature: _____
Name: Husnu M. Kalkanoglu
Title and Sub-Unit: Vice President of R&D
                    CertainTeed Roofing


**Connect by Computer, LLC,
dba Sun Energy Engineering Company and
BIPV, Inc.**

Signature: _____
Name: RON GANGEMI
Title: CEO / CTO

39468 v1
Mutual Non-Disclosure Agreement - CertainTeed         4

# EXHIBIT D

# PRIVATE LABELSUPPLY AGREEMENT

This **PRIVATE LABEL SUPPLY AGREEMENT** (the "Agreement"), dated as of August 23, 2011 is between CERTAINTEED CORPORATION, ROOFING PRODUCTS GROUP a Delaware corporation ("Buyer") and BIPV, INC., a Nevada corporation, the "Supplier").

## Background

A.  Supplier manufactures and sells solar shingle products for consumer housing applications.  Buyer is a manufacturer of roofing products for sale to the residential and commercial market.

B.  Buyer desires to purchase and Supplier desires to procure and sell to Buyer on a "private label" basis the solar shingle and flashing component products listed on **Exhibit A** hereto (the "Products") packaged in accordance with Buyer's specifications and on the other terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual representations and agreements contained herein and intending to be legally bound hereby, the parties hereto agree as follows:

1.    **Purchase and Sale of the Products.**

    1.1.  **Purchase and Sale**.  From time to time during the Term (as defined below), Buyer shall purchase from Supplier, and Supplier shall procure and sell to Buyer such quantities of the Products as Buyer orders. Such sales and purchases shall be made in accordance with Buyer's firm purchase orders.

    1.2.  **Manufacture to Specifications**.  All of the Products sold to Buyer hereunder shall be manufactured in accordance with the specifications for such Products set forth on **Exhibit B** (the "Product Specifications").  The Product Specifications for all Products shall be Supplier's current specifications as such specifications may be changed by Supplier from time to time on 60 days advance written notice to Buyer.

    1.3    **Product Packaging and Labeling.**  All Products sold to Buyer hereunder shall be packaged by Supplier in accordance with Buyer's packaging and labeling specifications set forth on **Exhibit C** as such specifications may be changed by mutual agreement of the Parties (the "Packaging Specifications").  Packaging and labeling costs in excess of Supplier's standard packaging and labeling costs shall be borne by Buyer.

2.    **Prices, Delivery and Payment.**

Exhibit 2

2.1.   **Prices; Taxes.**  The prices of the Products are listed on **Exhibit A** attached hereto.  Supplier may change its prices for the Products provided that it has given Buyer at least 30 days prior written notice.  Buyer's price shall be the price in effect on the day that Supplier receives Buyer's order.

2.2.   **Delivery.**  All deliveries of Products are FOB Supplier's facility.  Supplier shall arrange for delivery based on instructions in Buyer's purchase order.  If no instructions are given, Supplier shall arrange for freight at the most economical rates.

2.3.   **Invoicing and Payment.**  Supplier shall send via electronic submission all invoices to Buyer's Valley Forge, PA offices, Attention:  Accounts Payable.  The date of invoicing shall be the date the Products are shipped, and payment terms shall be net 30 days from the date of the invoice.  Payments shall be by electronic transmission on or before the due date.

3.     **Term.**  This Agreement shall commence as of the date hereof and continue until either party terminates this Agreement by giving the other no less than 90 days prior written notice.  The period from commencement through termination shall be referred to herein as the "Term".

4.     **Warranties and Remedies.**

4.1   **Supplier's Warranties and Buyer's Remedies.**  Supplier's current warranty to consumer purchasers of the solar shingle Products is attached hereto as **Exhibit D** ("Supplier's Product Warranty").  Buyer and Supplier acknowledge that the Products will be resold by Buyer to its roofing contractor customers for use on residential homes.  The intention of Supplier and Buyer is that Supplier will provide to Buyer the same remedies for a breach of warranty claim made by Buyer's customers (whether contractors or homeowners) against Buyer and related to the solar shingle Products as are available to Supplier's consumer customers.  To obtain reimbursement for a breach of warranty claim under Supplier's Product Warranty, Buyer must submit its invoice or other notice of claim document and provide Supplier with a reasonable amount of back-up information about the claim, and comply with any written claim procedure Supplier and Buyer agree to for handling claims (which warranty claim procedure shall be deemed to be a part of **Exhibit D**).  Supplier shall be reasonable in determining whether there has been a breach and approving claims, and shall evaluate claims coming through Buyer in the sme manner as those coming through Supplier's own customers.  Supplier shall be responsible for any payments made by Buyer or any losses incurred by Buyer for work performed by Buyer which is attributable to the approved warranty claim.  Supplier shall make such reimbursement within 30 days after invoicing by Buyer.

4.2.   **Supplier's Product Specification Warranty to Buyer.**  Supplier also warrants to Buyer that the Products sold under this Agreement shall conform to the Product Specifications and shall be free from defects in material and workmanship ("Supplier's Product Specification Warranty").

Page 2

4.3.   **Survival of Remedies**.   Supplier's obligations of warranty, remedy and reimbursement under this Section 4 shall survive the expiration or earlier termination of this Agreement.

5.   **Term;Termination.**

5.1.   **Early Termination.**  Prior to the expiration of the Term, this Agreement may be terminated as follows:

5.1.1.   by either Supplier or Buyer, immediately, if the other party is declared insolvent or bankrupt or files a petition in bankruptcy or makes any general assignment or trust for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy, or similar official shall be appointed to take charge of all or any substantial part of the other party's property by a court of competent jurisdiction; or

5.1.2   by either Supplier or Buyer, on 30 days written notice if the other party is in default of any other material term or condition of this Agreement and, upon receipt of such notice from the non-defaulting party, does not cure such default within such 30-day period.

5.2.   **Effect of Termination.**  Upon termination of this Agreement for any reason (including without limitation, its expiration according to the terms hereof), neither party shall be liable to the other for compensation, reimbursement or damages on account of the loss of prospective profits on anticipated sales or on account of expenditures, investments, leases or commitments made by such party in connection with this Agreement or otherwise in connection with its business except as otherwise set forth in Section 4 with respect to warranties, remedies and reimbursement.  The expiration or termination of this Agreement shall not affect the parties' rights and obligations with respect to Product delivered, or other actions taken, hereunder prior to termination, nor shall it, in the case of a termination under Section 5.1.2 be in lieu of or constitute a waiver of any other rights or remedies, either at law or in equity, of the non-defaulting party.

6.   **Force Majeure.**  Neither party shall be liable for failure or delay in the performance of its obligations under this Agreement to the extent such failure is a result of circumstances beyond its reasonable control, including but not limited to, fire, flood or other casualty or Act of God, strikes or other labor trouble, war (declared or undeclared), embargoes, blockades, legal restrictions, riots, insurrections or governmental regulations ("Force Majeure").  In the event either party is unable to carry out its obligations under this Agreement because of a Force Majeure situation, such party shall give notice thereof, including the full particulars of the situation and the expected duration thereof, to the other party not later than 10 days after the occurrence of the situation.  Upon the giving of such notice, the obligations of the party giving such notice, to the extent they are affected by such Force Majeure, shall be suspended during the continuance thereof and for a reasonable period of time thereafter, and such

cause shall, to the extent possible, be remedied with all reasonable dispatch; provided that neither party shall be required to resolve any strike, lockout or other labor problem in a manner that it determines is not proper or advisable. During the Force Majeure, Buyer shall be entitled to a fair and reasonable share of Supplier's output for the Product. Upon the cessation of the Force Majeure situation, full performance hereunder shall be resumed as soon as reasonably possible. No delay under this Section 6 shall operate to extend the Term of this Agreement.

7. **Patent, Copyrights, Trademarks**.

    7.1    **No Infringement**. Supplier warrants that the Products furnished under or used in connection with this Agreement and Buyer's express or reasonably implied intended use thereof, do not and will not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third party. If any claim, suit or proceeding is made or instituted against Buyer alleging any such infringement, Supplier shall indemnify, defend and hold Buyer harmless from and against any damages, liabilities, judgments, costs and expenses (including without limitation reasonable attorney's fees) it may incur in connection with any such claim, suit or proceeding. In the event that the Products or Buyer's use of the Products is held in any suit or proceeding to constitute an infringement, or if Supplier determines that there is a substantial risk of a finding of such infringement, Supplier agrees, as appropriate, and at its expense to: (a) procure for Buyer, at no expense to Buyer, the right to continue using the Products, (b) replace the Products with equivalent goods that meet the requirements of this Agreement and that do not infringe any such rights, or (c) modify the Products so that they become non-infringing. Supplier's obligations under this Section 7.1 shall survive the expiration or earlier termination of this Agreement.

    7.2    **Buyer's Intellectual Property Rights**. During the Term of this Agreement, Buyer may suggest modifications to the Products and Product Specifications, which Supplier shall have the right to incorporate into Products, pursuant to a fully paid up, non- transferrable license from Buyer. Upon termination of this Agreement for any reason Buyer may, subject only to any registered, issued, or pending IP rights Supplier may then have, develop its own competing products incorporating such modifications.

8. **Miscellaneous**.

    8.1.    **No Agency or Partnership**. Nothing in this Agreement shall be deemed to establish a partnership or joint venture between the parties. In addition, neither party shall have the power to bind, or incur any obligations, contractual or otherwise, or make any representations or warranties, for or in the name of, the other party. Each party shall be liable to the other for, and shall indemnify, defend and hold the other harmless from and against, any losses incurred by such other party as a result of any such unauthorized representations, warranties or obligations.

Page 4

8.2.     **Notices.**  All notices or communications required or permitted under this Agreement shall be in writing and shall be hand delivered or sent by registered or certified mail, postage prepaid, or by telecopier or recognized overnight carrier, to the intended recipient at the address and attention designated on the signature page hereof or to such other address or attention as the recipient may have designated in a writing given pursuant to this Section.  Any such notice or communication shall be deemed delivered as follows: if hand delivered, on the day so delivered; if mailed, three business days after the date so mailed; if telecopied, upon telephone confirmation of receipt; and if sent by recognized overnight carrier, the next business day.

8.3.     **Binding Effect; Assignment.**  This Agreement shall inure to the benefit of, and be binding upon and enforceable by, the parties hereto and their respective successors and permitted assigns.  This Agreement shall not be assignable by Supplier without the prior written consent of Buyer, except that Supplier shall have the right to assign this Agreement to (i) any of its affiliates; or (ii) to a buyer of all or substantially all of the stock or assets of Supplier.  Except as expressly permitted herein, any purported assignment made without such consent shall be null and void.

8.4.     **No Third Party Beneficiary Rights.**  Nothing in this Agreement is intended to create, or shall be construed as creating, any rights in any third party.

8.5.     **Supplier's Insurance.**  Supplier shall, during the term of this Agreement and for a period of two years following the termination, maintain insurance coverages as set forth on **Exhibit E.**

8.6.     **No Waiver of Defaults.**  No failure by any party at any time, or from time to time, to enforce any of the terms or conditions of this Agreement shall constitute a waiver thereof or shall in any way impair such party's right at any time to avail itself of such remedies as it may have to enforce such terms or conditions.  No waiver by any party hereunder will be effective unless in writing and signed by such party.

8.7.     **Headings.**  The headings used in this Agreement are for convenience only and shall not be deemed to constitute a part of, or be used in the interpretation of, this Agreement.

8.8.     **Severability.**  Any provision of this Agreement that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability and reformed so as to be enforceable to the maximum extent permitted by law, without invalidating the remaining provisions of this Agreement, and any such unenforceability in any jurisdiction shall not render unenforceable such provision in any other jurisdiction.

8.9.     **Entire Agreement; Amendment.**  This Agreement contains the entire agreement between the parties with respect to the sale and purchase of the Products and except for the Mutual Nondisclosure Agreement dated October 28, 2010, which remains in full force and effect, supersedes all prior agreements, understandings and

representations, whether written or oral, regarding the subject matter hereof. This Agreement may not be amended, modified or rescinded in any respect except by the prior written agreement of both parties. The terms of this Agreement shall supersede the terms of any purchase order, acknowledgment, invoice or other document used by Buyer or Supplier in the purchase or sale of the Products hereunder.

8.10. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same document. This Agreement shall become binding only when each party hereto has executed and delivered to the others one or more such counterparts.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first written above.

**BIPV, INC.**

By: _____
Name: Ronald J. Gangemi
Title:   CEO – BIPV, Inc.

**CERTAINTEED CORPORATION, ROOFING PRODUCTS GROUP**

By: _____
Name: Thomas M. Smith
Title:    Vice President – CertainTeed Corporation

Address:

908 Taylorville Road, Suite 203
Grass Valley, CA95949

Address:

750 E. Swedeford Rd. Box 860
Valley Forge, PA19482

Page 6

## EXHIBIT A

## PRODUCTS AND PRICING

The Products are Sun Energy Shingles and Flashing Components listed below.

Product Pricing shall be BIPV distributor pricing listed below.  These prices are intended to be temporary only and will be re-negotiated periodically.

SUN ENERGY SHINGLES 52 W [BIPV052-SX6]
Standard Colors [Choice of Gray or Brown Frames with Dark Blue Cells]

|  | Distributor | | Dealer | Contractor |
|---|---|---|---|---|
| Calendar Quarter Purchases | 1000 - 3000 | 3000+ | 250-999 | 1-250 |
| Price Per: | | | | |
| Panel | $  147.15 | $   132.00 | $  156.96 | $  168.17 |
| Watt | $      2.83 | $       2.54 | $      3.02 | $      3.23 |

SUN ENERGY FLASHING COMPONENTS

| Order Quantity Pricing | 250 to 500 | 501 to 1000 | 1001 + |
|---|---|---|---|
| SE0015-46G -- Starter Strip [ With Powder Coat] | $15.59 | 14.32 | 13.39 |
| SE0017G -- Right-Side Flashing | $9.18 | $8.24 | $8.06 |
| SE0018G -- Left-Side Flashing | $9.18 | $8.25 | $8.06 |

"Calendar Quarter Purchases" shall be defined as Buyer's total Product Purchase Orders accepted within the Calendar Quarter for delivery within fifteen days after the end of the Calendar Quarter.

Seller shall provide written notice 2 weeks in advance of any price change.

## EXHIBIT B

## SUPPLIER'S PRODUCT SPECIFICATIONS

# Product Specification Standard

## Scope

This Specification covers Photovoltaic (PV) Shingles to be produced by the Supplier through third-party manufacturing and subsequently purchased by the Buyer for private labeling and sale. This specification covers model series BIPV0XX-SYY where "S" indicates that it is a shingle-integrated product, "YY"indicates the frame color and "XX" is the power output in Watts. Products from model series BIPV0XX-SYYare referred to in the remainder of this document as "PV Shingle." The producing location considered for the PV Shingle product will need to be evaluated and qualified prior to use.

Determination of use for acceptance and qualification of a PV Shingle will be the responsibility of the CertainTeed Roofing. Finished product evaluations of a PV Shingle will be conducted by CertainTeed Roofing for desired performance characteristics and will be the sole determinant for acceptability and use.

The PV Shingle must meet, except as noted in this document, UL 1703 requirements at a 100% compliance level whencollected randomly from a received inventory lot, per ASTM E122-09.

## Product Description

The PV Shingle is capable of producing DC power by means of crystalline cells encapsulated in a laminate which in turn is bonded to the polymer frame. The PV Shingle has sufficient durability to perform as a waterproofing element as well as a power generating element.

There will be no changes by the Supplier to any component of the PV shingle or in any process by which it is manufactured without 30 days prior written notice to Buyer. Simultaneously, documentation of proposed changes must be provided to Buyer. Such documentation may include drawings, specification sheets or similar data pertaining to changes. Additionally, when changes are implemented, sufficient quantities of samples shall be provided to the Buyer for evaluation. Also required is validation by the Buyer of successful application to the roof by professional contractors without jeopardizing the product's short and long-term performance as a waterproofing element and as a power generating element.

The product described in greater detail in this document is the model series BIPV0XX-SYY which was certified by CSA International under Master Contract 252316, Project 2401781 and whose Certification Report was issued May 5, 2011. Certificate of Compliance located in Appendix A. Certification Record located in Appendix B.

## Electrical Specifications

Construction
All components and materials to be as specified in CSA International Certification Record issued May 5th, 2011 and corresponding to File No: 252316. Certification Record located in Appendix B.

Electrical specification ranges

| Output Characteristics | Units | LSL[1] | Target | USL[1] |
|---|---|---|---|---|
| Maximum Power (Pmax)* | Watts | 50.4 | 52.0 | N/A |
| Maximum Power Voltage (Vmp)* | Volts | 6.59 | 6.79 | N/A |
| Maximum Power Current (Imp)* | Amps | 7.42 | 7.65 | N/A |
| Open Circuit Voltage (Voc)* | Volts | 8.44 | 8.70 | 9.2 |
| Short Circuit Current (Isc)* | Amps | 7.83 | 8.07 | N/A |
| Power Temp Coefficient | %/°C | - | -0.54 | - |
| Voltage Temp Coefficient | %/°C | - | -0.37 | - |
| Normal Operating Cell Temperature (NOCT) | °C | - | 58.5 | - |
| PTC Rating | Watts | 39.9 | 41.2 | 42.4 |

*Output power as measured under Standard Test Conditions [1000 W/m², AM 1.5, 25°C ambient] using an I-V tester calibrated with an NREL measured photovoltaic module
[1]Specifications may change based on manufacturing data pending agreement by Supplier and Buyer

## Mechanical Specifications

Construction
All components and materials to be as specified in CSA International Certification Record issued May 5th, 2011 and corresponding to File No: 252316. Certification Record located in Appendix B.

Mechanical Specifications
- A. Frame and overall product dimensions and tolerances as specified on the Sun Energy Shingle Drawing located in Appendix C.
- B. Appropriate labeling applied with text and graphics including the "CSA mark" as well as any information required by CSA International to be compliant with their certification.
- C. Bar code or serial number traceable to the date and lot number of their manufacture.

## Visual Appearance

The following are considered PV Shingle defects and are reasons for rejection.
- A. The Supplier is required to provide a standard cell color from which all incoming PV Shingles will be evaluated for color consistency. Deviation, to be agreed upon by Supplier and CertainTeed Roofing, from the standard cell color is reason for rejection.
- B. The Supplier is required to provide a standard polymer frame from which all incoming PV Shingles will be evaluated for color consistency. Deviation, to be agreed upon by Supplier and CertainTeed Roofing, from the standard frame color is reason for rejection.
- C. Blemishes on the cells, backsheet or frame greater than 1/8" diameter
- D. Air bubbles in the encapsulant greater than 1/16" diameter and more than 1/ft²
- E. Any cracks in the PV laminate glass
- F. Scratches in the glass longer than ½" or deeper than 1/16"
- G. Chips in the glass of any size or location
- H. Cracks in or excessive external damage to the polymer frame
- I. Incomplete molding of the polymer frame or other manufacturing defects
- J. Excessive adhesive which looks unsightly

The receiving plant must inspect the PV Shingle when received for signs of transit damage. If damage is seen, the carrier should be notified and present before the truck is unloaded. If, however, improper loading is suspected, the Supplier should be contacted before the shipment is unloaded.

Page 9

## Shipping

Trucks must be prepared and loaded in such a way as to minimize damage.
1. Trailer walls are to be free of nails, strapping, etc. that could cause damage
2. Trailer floors are to be free of debris and contamination that could cause damage

## Storage

See Exhibit C for storage information specific to packaging.

## Identification

Each packaging unit, as described in Exhibit C, will be identified by:
A. Manufacturing date
B. Model number
C. Quantity of PV Shingles
D. Final product inspector's ID

## Data Requirements

Supplier must provide the Quality Control Manager at each receiving plant and the Quality Assurance Director at Blue Bell the Certificate of Analysis (COA) for each PV Shingle at or before receipt of shipment by Buyer. This document certifies that all finished PV Shingles included in the shipment have passed agreed upon quality control requirements. The data requirements include:
A. Series number (identical to barcode number)
B. Maximum power (Pmax)
C. Maximum power-point voltage (Vmp)
D. Maximum power-point current (Imp)
E. Open-circuit voltage (Voc)
F. Short-circuit current (Isc)

See Certificate of Analysis template located in Appendix D.

Shipments not containing this documentation will be held and only released upon receipt of the documents and satisfactory review. If Supplier cannot furnish such documents, Buyer may reject shipment. The Buyer reserves the right to conduct random sampling per ASTM E122-09 to confirm 100% compliance. If a PV Shingle selected for sampling fails, the Buyer reserves the right to reject the entire shipment or negotiate an action plan with the Supplier.

## National Recognized Testing Laboratory (NRTL) Requirement

The Supplier is required to maintain the CSA registered "CSA" mark on each PV Shingle.
All PV Shingles purchased under this supply agreement must conform to the Certificate of Compliance located in Appendix A and must be marked as such. Supplier must provide Buyer with 60 days advance written notice of any changes to the indicated listing.. Any changes must be approved and agreed upon by CertainTeed Roofing.

## Cause for Rejection

Buyer reserves the option to return any PV Shingle which deviates from any of the electrical, mechanical specifications listed. Buyer reserves the option to return any PV Shingle containing visual defects as listed in the Visual Appearance section. All returns will be at Supplier's cost. Supplier will be given the opportunity to inspect any PV Shingle before it is returned.

A Material Rejection Notice Letter will accompany any PV Shingle returned by the Buyer.

## Appendix A



CSA INTERNATIONAL

# Certificate of Compliance

| | | | | |
|---|---|---|---|---|
| Certificate: | 2401781 | | Master Contract: | 252316 |
| Project: | 2401781 | | Date Issued: | May 5, 2011 |
| Issued to: | BIPV Inc | | | |
| | 908 Taylorville Rd | | | |
| | Grass Valley, CA 95949 | | | |
| | US | | | |

*The products listed below are eligible to bear the CSA Mark shown with adjacent indicators 'C' and 'US' for Canada and US or with adjacent indicator 'US' for US only or without either indicator for Canada only.*



C        US

*Brij Aggarwal*
Issued by:   Brij Aggarwal, P.Eng.

**PRODUCTS**

CLASS 5311 10   – POWER SUPPLIES – Photovoltaic Modules and Panels
CLASS 5311 90   – POWER SUPPLIES – Photovoltaic Modules and Panels – Certified to US
Standards

Photovoltaic Modules with maximum system voltage of 600 V dc and Class A fire rating (with two layers of VersaShield), Model Series BIPV0XX-SYY and BIPV0XX-TYY where YY is the frame color and XX is the power output from 47 W to 57 W with the following electrical ratings typical at 52 W @ Standard Test Condition (STC):

Open Circuit Voltage:  8.70 V dc

Short Circuit Current:  8.07 A

Operating Voltage:  6.79 V dc

Current at Operating Voltage:  7.69 A

**Notes:**

Rated electrical characteristics are within +/-10% of measured values at Standard Test Conditions of 100 mW/cm2 irradiance, AM 1.5 spectrum, and 25°C.

DQD 507 Rev. 2009-08-01                                                    Page 1

## Appendix B

Cert.Record No 252316, Class No 5311 10, DQD No 548 Rev.2001-10-31                    Page 1 of 1



**CSA INTERNATIONAL**

**CERTIFICATION RECORD**

The use of any mark referred has been authorized by CSA International to represent the products listed in this record as "CSA Certified" and to affix the CSA Mark to these products according to the terms and conditions of that CSA service Agreement and applicable CSA program requirements (including additional Marks used).

File No:        252316

Class No:    5311 10 POWER SUPPLIES Photovoltaic Modules and Panels

**SUBMITTOR**

4770855     BIPV Inc.
908 Taylorville Rd
Grass Valley, CA 95949
USA

**FACTORIES**

4791695     NESL USA
18280 SW 108th Ave
Tualatin, OR 97062
USA

To,

May 5, 2011

* Photovoltaic Modules with maximum system voltage of 600 V dc and Class A fire rating (with two layers of VersaShield), Model Series BIPV0XX-SYY and BIPV0XX-FYY, where YY is the frame color and XX is the power output from 47 W to 57 W, with the following electrical ratings typical at 52 W @ Standard Test Condition (STC):
  Open Circuit Voltage:          8.70 V dc
  Short Circuit Current:         8.07 A
  Operating Voltage:             6.79 V dc
  Current at Operating Voltage:  7.69 A

Note:  Rated electrical characteristics are within 1/-10% of measured values at Standard Test Conditions of 100 mW/cm² Irradiance, AM 1.5 spectrum, and 25 deg. C.

Page 12

## Appendix C



18 7/8 – 19 3/8"

CABLE DIMS FROM
EDGE OF J BOX

41 3/4 to 42 1/2

**Sun Energy Shingle
Wire Lengths**

Page 13



| Sun Energy Shingle Assembly | | | |
|---|---|---|---|
| Part No. BIPV052-S86 | | | |
| Item | QTY | Part # | Description |
| A | 1 | SE0014-052-NPC5 | Laminate |
| B | 2 | SE0024 | Shingle Frame |
| C | 1 | SE0031/SE001D | Jbox / Cable Assembly |
| D | 1 | SE0022 | Dow Adhesive |

Page 14



.075 to .135 GAP
top and bottom

**Sun Energy Shingle
Center Joint**

Page 15



**Sun Energy Shingle**
**Outer dimensions**

Page 16



min/max inch    [metric]    Sun Energy Shingle
Cell registration / tolerance

## Appendix D

| No. | Series No. | Voc (V) | Isc (A) | Pmax (W) | Vpm (V) | Ipm (A) | FF |
|---|---|---|---|---|---|---|---|
| | | | **LC No: 0** | | | | |

**NESL  China  Jiangsu  Changzhou**

Phone +86 (0)519 86886322

www.nesl.cn

**Flash   Report**

Order NO:

Container No.

Solar module type: DJ-52P

Pallet No:                                    —

| No. | Series No. | Voc (V) | Isc (A) | Pmax (W) | Vpm (V) | Ipm (A) | FF |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |
| 16 | | | | | | | |
| | Average | | | | | | |
| | Standard Deviation | | | | | | |

| Total Watt : | | 0.00 W | |
|---|---|---|---|
| Name: | Date: | Stamp: | |

Page 18

## EXHIBIT C

## BUYER'S PACKAGING SPECIFICATIONS

A.   Packaging to be the cardboard box shown in this exhibit secured to a pallet.  Cardboard box specified is constructed of triple-wall cardboard with outside dimensions of 47 1/8" x 17 7/8" x 12 7/8".

B.   Packaging must fill any space not filled by PV Shingles such that PV Shingles must not be allowed to move freely after being packed in box.

C.   Multiple cardboard boxes on the pallet must be shrink or stretch wrapped together.

D.   The cardboard boxes must be banded to the pallet using polypropylene or metal bands.  A minimum of one (1) band centered in the width direction and one (1) band centered in the length direction must be used as shown in the illustration in this exhibit.

E.   PV Shingles packaged in the box must be separated by standard double-wall cardboard or alternatively 1/8" thick Styrofoam sheets or equivalent.

F.   PV Shingle wires must be secured in wire clips and taped in place when necessary.  Packing must not damage the electrical connectors of the PV Shingle.  Crushed or deformed PV Shingle electrical connectors may result in rejection of that PV Shingle.

G.   Pallets may not be stacked on top of one another.  A maximum of three cardboard boxes may be stacked with a proper separator sheeting in between.

H.   In addition to the packaging label requirements described in Exhibit B, each pallet must have the following labels or equivalent:
   a.   "Fragile"
   b.   "No Stack"

I.   Packaging requirements may be changed in the future subject to Buyer and Supplier agreement.

Page 19



Banding in the "length" and "width" directions.

GLASS PANELS
10 PCS

17 9/16"

47 1/8"

12.7/8"

EXHIBIT D

Page 20

## BIPV, Inc. Limited Warranty
### Sun Energy Shingles™ – Sun Energy Tiles™

**1. Limited Product Warranty – Ten (10) Year Repair, Replacement or Refund Remedy**

BIPV, Inc. warrants to the first consumer purchaser ("Purchaser") that the BIPV, Inc. Sun Energy Shingles™ – Sun Energy Tiles™ (the "Product(s)"), when shipped in their original containers and used under normal application, installation, use and service conditions (s) conform to the published specifications, and (b) are free from defects in materials or workmanship. This Warranty expires ten (10) years from the date of delivery to Purchaser. If the Purchaser discovers within this period a failure of the Product to conform to specifications, or a defect in material or workmanship, the Purchaser must promptly notify BIPV, Inc. in writing. In no event may that notification be received by BIPV, Inc. later than one hundred twenty-one (121) months after the date of delivery to Purchaser. Within a reasonable time after notification, BIPV, Inc. will provide, at its option, one of the following remedies: a) repair of the Product; b) a replacement Product; or c) a full refund of the purchase price paid by the Purchaser. These remedies are the Purchaser's only remedies for breach of warranty.

This Limited Product Warranty does not warrant a specific power output. Power output of the Product is exclusively covered under the BIPV, Inc. Limited Power Warranty.

**2. Limited Warranty of Power Output**

BIPV, Inc. warrants to the first consumer purchaser ("Purchaser") that the BIPV, Inc. Sun Energy Shingles™ – Sun Energy Tiles™ (the "Product(s)") will provide power output as follows:

a)   Under normal application, installation, use and service conditions for the period ending twelve (12) years from the date of delivery to Purchaser, the Products shall provide power output equal to at least 80% of the Minimum Peak Power as specified at the date of delivery in the relevant Product data sheet. If during that period there is reduced power output as determined by BIPV, Inc. (at its sole and absolute discretion) that is due to defects in materials or workmanship, BIPV, Inc. will replace such loss in power by either providing to the Purchaser additional Products to make up such loss in power or by providing monetary compensation equivalent to the cost of additional Products required to make up such loss in power or by repairing or replacing the defective Products, at the option of BIPV, Inc.

b)   Under normal application, installation, use and service conditions for the period beginning twelve (12) years and ending twenty-five (25) years from the date of delivery to Purchaser, the Products shall provide power output equal to at least 80% of the Minimum Peak Power as specified at the date of delivery in the relevant Product data sheet. If during that period there is reduced power output as determined by BIPV, Inc. (at its sole and absolute discretion) that is due to defects in materials or workmanship, BIPV, Inc. will replace such loss in power by either providing to the Purchaser additional Products to make up such loss in power or by providing monetary compensation equivalent to the cost of additional Products required to make up such loss in power or by repairing or replacing the defective Products, at the option of BIPV, Inc.

c)   For any Product used on a mobile platform of any type, the Power Output Warranty is limited to the twelve (12) year period provided in Section 2 a).

**3. Exclusions from Warranties**

These Warranties do not cover:

a)   Damage caused by power failure surges, lightning, flood, fire, accidental breakage or other events outside of BIPV, Inc.'s control.

b)   Damage caused by misuse, abuse, neglect, accident, alteration, improper installation, use, application or removal of the Product.

c)   Cosmetic changes or defects stemming from normal wear and tear of Product materials.

d)   Products on which the type or serial number of the Product has been altered, removed or made illegible.

e)   Any cost or expense incurred for, related to or associated with installation, removal or reinstallation of the Products.

f)   Any transportation costs for return of the Products or for shipment of any repaired or replacement Products.

**4. Disclaimer of Warranty**

THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**5. Limitation of Remedies**

IN NO EVENT WILL BIPV, Inc. BE LIABLE FOR ANY SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES BASED ON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, STRICT TORT, OR ANY OTHER LEGAL THEORY. DAMAGES THAT BIPV, Inc. WILL NOT BE RESPONSIBLE FOR INCLUDE, BUT ARE NOT LIMITED TO: LOSS OF PROFITS; LOSS OF SAVINGS OR REVENUE; LOSS OF USE OF THE PRODUCT OR ANY ASSOCIATED EQUIPMENT; COST OF CAPITAL; COST OF ANY SUBSTITUTE EQUIPMENT, FACILITIES, OR SERVICES; DOWNTIME; THE CLAIMS OF THIRD PARTIES, INCLUDING CUSTOMERS; AND INJURY TO PROPERTY.

**6. Warranty Claims**

If you feel you have a justified claim covered by this Limited Warranty, immediately notify BIPV, Inc., 988 Taylorville Road, Suite 303, Grass Valley, CA 95949. Notice must be in writing and accompanied by evidence of the date of delivery of the Product. The return of any Products will not be accepted unless prior written authorization has been given by BIPV, Inc.

**7. No Other Warranties**

Unless modified in a writing signed by both parties, this agreement is understood to be the complete and exclusive agreement between the parties, superseding all oral or written prior agreements and all other communications between the parties relating to the subject matter of this agreement, including statements made by salespersons. No employee of BIPV, Inc. or any other party is authorized to make any warranty in addition to those made in this agreement.

# EXHIBIT E

Page 21

## SUPPLIER'S INSURANCE COVERAGES

Supplier has furnished Buyer Certificates of Insurance showing insurance in effect, copies of which are attached hereto showing coverage and limits as mutually agreed by the Parties and providing for at least thirty (30) days prior written notice of cancellation or modification resulting in a reduction below the minimum coverage required.  Seller shall provide evidence of the renewal of all such coverage prior to any expiration thereof.

Page 22

# CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 08/04/2011 |

| PRODUCER   (530) 272-1234 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| IB&C INSURANCE SERVICES, INC. | | |
| PO BOX 984 | | |
| 1105 SUTTON WAY | | |
| GRASS VALLEY          CA  95945- | INSURERS AFFORDING COVERAGE | NAIC # |
| INSURED    BIPV, Inc. | INSURER A: Colony Insurance | |
| | INSURER B: | |
| 908 Taylorville Rd. #203 | INSURER C: | |
| Nevada County | INSURER D: | |
| Grass Valley          CA  95945- | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YYYY) | POLICY EXPIRATION DATE (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | X | GENERAL LIABILITY | GL952652 | 08/04/2011 | 08/04/2012 | EACH OCCURRENCE | $  1,000,000 |
| | | X  COMMERCIAL GENERAL LIABILITY | | / / | / / | DAMAGE TO RENTED PREMISES (Ea occurrence) | $   100,000 |
| | | CLAIMS MADE  X  OCCUR | | / / | / / | MED EXP (Any one person) | $    10,000 |
| | | | | / / | / / | PERSONAL & ADV INJURY | $  1,000,000 |
| | | | | / / | / / | GENERAL AGGREGATE | $  2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | / / | / / | PRODUCTS - COMP/OP AGG | $  2,000,000 |
| | | POLICY   PRO-JECT   LOC | | / / | / / | | |
| A | | AUTOMOBILE LIABILITY | | / / | / / | COMBINED SINGLE LIMIT (Ea accident) | $  1,000,000 |
| | | ANY AUTO | | / / | / / | | |
| | | ALL OWNED AUTOS | | / / | / / | BODILY INJURY (Per person) | $ |
| | | SCHEDULED AUTOS | | / / | / / | | |
| | X | HIRED AUTOS | | / / | / / | BODILY INJURY (Per accident) | $ |
| | X | NON-OWNED AUTOS | | / / | / / | | |
| | | | | / / | / / | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY | | / / | / / | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | / / | / / | OTHER THAN   EA ACC | $ |
| | | | | | | AUTO ONLY:   AGG | $ |
| | | EXCESS / UMBRELLA LIABILITY | | / / | / / | EACH OCCURRENCE | $ |
| | | OCCUR   CLAIMS MADE | | / / | / / | AGGREGATE | $ |
| | | | | / / | / / | | $ |
| | | DEDUCTIBLE | | / / | / / | | $ |
| | | RETENTION   $ | | / / | / / | | $ |
| | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | | / / | / / | WC STATU-TORY LIMITS   OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  Y/N (Mandatory in NH) | | / / | / / | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under SPECIAL PROVISIONS below | | / / | / / | E.L. DISEASE - EA EMPLOYEE | $ |
| | | OTHER | | / / | / / | E.L. DISEASE - POLICY LIMIT | $ |
| | | | | / / | / / | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS

Solar Panels
Additional Insured: CertainTeed Corporation, Its affiliates and each of their respective directors, officers, employees and agents.  Insurance shall be Primary and Noncontributory.  Waiver of Subrogation in favor of CertainTeed Corporation.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| (    )     -          (    )     - | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL  030  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| CertainTeed Corporation | |
| 750 E. Swedeford Road, Box 860 | AUTHORIZED REPRESENTATIVE |
| Valley Forge       PA  19482- | |

ACORD 25 (2009/01)                                                    © 1988-2009 ACORD CORPORATION.  All rights reserved.
INS025 (200901)                The ACORD name and logo are registered marks of ACORD



P.O. BOX 420007, SAN FRANCISCO, CA 94142-0807

CERTIFICATE OF WORKERS' COMPENSATION INSURANCE

August 16, 2011

POLICY NUMBER: 1938176-2011
CERTIFICATE EXPIRES: 08-01-2012
Coverage Period: 08-09-2011/08-01-2012

CERTAIN TEED CORPORATION
750 E SWEDESFORD RD BOX 860
VALLEY FORGE PA. 19482

This is to certify that we have issued a valid Workers' Compensation insurance policy in a form approved by the California Insurance Commissioner to the employer named below for the policy period indicated.

This policy is not subject to cancellation by the Fund except upon ten days' advance written notice to the employer.

We will also give you TEN days' advance notice should this policy be cancelled prior to its normal expiration.

This certificate of insurance is not an insurance policy and does not amend, extend or alter the coverage afforded by the policy listed herein. Notwithstanding any requirement, term, or condition of any contract or other document with respect to which this certificate of insurance may be issued or to which it may pertain, the insurance afforded by the policy described herein is subject to all the terms, exclusions and conditions of such policy.

AUTHORIZED REPRESENTATIVE

PRESIDENT AND CFO

EMPLOYER'S LIABILITY LIMIT INCLUDING DEFENSE COSTS: $1,000,000 PER OCCURRENCE

EMPLOYER

BIPV INC
908 TAYLORSVILLE RD
GRASS VALLEY CA 95945

Page 24

# EXHIBIT E

January 6, 2012

**PERSONAL AND CONFIDENTIAL**

BIPV, Inc.
Attn:  Ron Gangemi
908 Taylorville Road, Suite 203
Grass Valley, CA  95949

Dear Ron:

In connection with CertainTeed Corporation, Roofing Product Group's consideration of a possible transaction involving BIPV, Inc. (the "Company"), we have requested information concerning the Company.  As a condition to our being furnished such information, we agree to treat any information concerning the Company (whether prepared by the Company, its advisors or otherwise) which is furnished to us by or on behalf of the Company (collectively  "Evaluation Material") in accordance with the provisions of this letter and to take or abstain from taking certain other actions as set forth herein.  The term "Evaluation Material" shall not include information which (i) is already in our possession or in the possession of our parent corporation or affiliates (collectively, "Affiliates"), provided that such information is not known by us to be subject to another confidentiality agreement with or other obligation of secrecy to the Company or another party; (ii) is or becomes generally available to the public other than as a result of a disclosure by us, our Affiliates, or our respective directors, officers, employees, agents, advisors and representatives (collectively "Representatives") in violation of this letter agreement; (iii) becomes available to us or our Affiliates on a non-confidential basis from a source other than the Company or its advisors, provided that such source is not known by us or our Affiliates to be bound by a confidentiality agreement with or other obligation of secrecy to the Company or another party; or (iv) is independently developed by us or by our Affiliates without use of the Evaluation Material.

We hereby agree that the Evaluation Material will be used solely for the purpose of evaluating a possible transaction between the Company and us or one of our Affiliates, and that such information will be kept confidential by us, our Affiliates, and our Representatives; provided, however, that (i) any of such information may be disclosed to our Representatives who need to know such information for the purpose of evaluating any such possible transaction (it being understood that such Representatives shall be informed of the confidential nature of such information and shall be directed to treat such

Exhibit 4

Page 2

information confidentially), and (ii) any disclosure of such information may be made to which the Company consents in writing.

In addition, without the prior written consent of the Company, we and our Affiliates will not, and we will direct our Representatives not to, disclose to any person either the fact that discussions or negotiations are taking place concerning a possible transaction between the Company and us, or any of the terms, conditions or other facts with respect to any such possible transaction, including the status thereof.

It is agreed that our obligation of non-disclosure, non-use and confidentiality as set forth herein shall terminate upon the earlier of (i) the consummation of the proposed transaction or (ii) two (2) years after the date of this letter.

In the event that we or one of our Affiliates become legally compelled (by interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Evaluation Material supplied to us or our Representatives in the course of our dealings with the Company or its representatives, we agree to provide the Company with prompt notice of such request(s) so that it may seek an appropriate protective order or other appropriate remedy and/or waive our compliance with the provisions of this letter.  If such protective order or other remedy is not timely obtained by the Company, or if the Company waives compliance with the provisions of this letter, we agree that we will furnish only that portion of the Evaluation Material which is legally required in the opinion of our counsel.

Although the Company will endeavor to include in the Evaluation Material information known to it which it believes to be relevant for the purpose of our investigation, we understand that neither the Company nor any of its representatives have made or make any representation or warranty as to the accuracy or completeness of the Evaluation Material.  We agree that neither the Company nor its representatives shall have any liability to us, our Affiliates, or any of our Representatives, resulting from the use of the Evaluation Material, except as may otherwise be provided in any executed and delivered definitive agreement between the Company and us (or one of our Affiliates) with respect to any transaction referred to in the first paragraph of this letter.

In the event that we do not proceed with the transaction which is the subject of this letter within a reasonable time, we shall, upon the written request of the Company, promptly destroy or return to the Company all copies of written Evaluation Material.  Any materials prepared by us, our Affiliates, or any of our Representatives that contain references to the Evaluation Material ("Notes") shall be destroyed and if requested by the Company, such destruction shall be certified in writing to the Company by one of our authorized Representatives.  Notwithstanding the foregoing, upon written notice to the Company, we may elect to retain in our Law Department's files one copy of the Evaluation Material and one copy of the Notes to be accessed solely for purposes of demonstrating our compliance with this Agreement in the event of a dispute.  Nothing in this letter agreement, however, shall require us to alter or deviate from our normal record retention policies or to expunge from our records internally generated files, electronic media,

Page 3

references, notes, analyses or memoranda related to the existence of, or relating to, the possible transaction; provided, however, that such information shall be retained and/or disclosed subject to the terms and conditions of this letter agreement.

We agree that unless and until a definitive agreement between the Company and us (or one of our Affiliates) with respect to any transaction referred to in the first paragraph of this letter has been executed and delivered, neither we or our Affiliates nor the Company will be under any legal obligation of any kind whatsoever with respect to such a transaction by virtue of this or any other written or oral expression with respect to such a transaction by any of our representatives, except as to the matters specifically agreed to in this letter. The agreement set forth in this paragraph may be modified or waived only by a separate writing by the Company and us expressly so modifying or waiving such agreement. For the purposes of this Agreement, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement.

This letter shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to its principles of conflicts of laws.

If you agree to the foregoing, please execute the extra copy of this letter in the space provided and return it to me.

Very truly yours,

CERTAINTEED CORPORATION, ROOFING PRODUCTS GROUP

By: _____
Name: ROBERT E GARDNER
Title: Vice President Marketing

Confirmed and agreed to by:

BIPV, INC.

By: _____
Name: RONALD GANGEMI
Title: CEO

# EXHIBIT F

# CertainTeed ⊟

Ship To:

Certainteed Corporation
RPG Fremont, CA
6400 Stevenson Blvd.
FREMONT CA  94538

| | |
|---|---|
| **PURCHASE ORDER 3000160722 REV:** | |
| **Date:** 01/31/2012 | **Time:** 14:40:47 |

Please enter our order for material or services shown below subject to all conditions and instructions contained herein and below. Bill of Lading must accompany Invoice and show terms, Car/Trailer Number, FOB Point, and whether shipped Prepaid or Collect. If Prepaid, copy of Freight Bill must accompany Invoice.

Supplier:

173407
BIPV INC
908 TAYLORVILLE ROAD, SUITE 203
GRASS VALLEY CA  95949
530-272-1703

Our PO Number must appear on all Correspondence
(Invoices, Packing Slips, Shipping Documents & Shipping Containers)

**RENDER INVOICE IN DUPLICATE TO US AT:**

CertainTeed Corporation - EPG
P.O. Box 6100
Southeastern, PA 19398

| FOB: | Via: | Terms Net 30 Days |
|---|---|---|

Purchasing:   Chris Steiner 610-341-7685

| Line | Quantity | U/M | Item Number<br>Description<br>Vendor Item Number | Unit Price | Amount |
|---|---|---|---|---|---|
| | Delivery Date | | | | Tax |
| 0010 | 1,500 | EA | 409830<br>Apollo PV Sun Energy Shingle 52W Std Cel | 101,400.00 | 152,100.00 |
| | 04/30/12 | | | | 0.00 |
| | | | Requisitioner:<br>Internal Order: | | |
| 0020 | 2,820 | EA | 409830<br>Apollo PV Sun Energy Shingle 52W Std Cel | 91,000.00 | 256,620.00 |
| | 04/30/12 | | | | 0.00 |
| | | | Requisitioner:<br>Internal Order: | | |

Gray Frame / Standard Cell

The terms and conditions of this Purchase Order, pursuant to which all purchases by the Company of goods and services are made, are available at http://www.saint-gobain-corporation.com/ and together with the Purchase Order represent the entire agreement between the Company and the Seller. The delivery of any goods or the furnishing of any services pursuant to this Purchase Order shall constitute acceptance by the Seller of Terms and Conditions.

CertainTeed Corporation

Chris Steiner

*AN EQUAL OPPORTUNITY EMPLOYER*
Equal Opportunity Clause:   Unless otherwise exempted by rules, regulations, or orders issued under Executive Order 11246, Section 204;Executive Order 11701, Section 402; or The Vocational Rehabilitation Act of 1973 (Executive Order 1758), Section 503, CertainTeed Corporation will include by reference the required non discrimination clauses in all Subcontracts which exceed $2,500.00 and in all Purchase Orders.

Page 1 of  3

05-12-0035 VF 2/99 (I.G.)

Exhibit 5



# EXHIBIT G

## PURCHASE ORDER TERMS AND CONDITIONS

1. **Terms.**  The terms and conditions of this Purchase Order, including those on the face hereof and those set forth below and in the Supplemental Terms and Conditions attached hereto, if any, represent the entire agreement between Seller and Buyer.  Acceptance is limited to the terms and conditions of this Purchase Order, and no purported revisions of, additions to, or deletions from this Purchase Order shall be effective, whether in Seller's proposal, invoice, acknowledgement or otherwise, and no local, general or trade custom or usage, shall be deemed to affect any variation herein unless expressly agreed to in writing by Buyer's authorized representative.  The delivery of any goods or the furnishing of any services pursuant to this Purchase Order shall constitute acceptance by Seller of this Purchase Order subject to, and in strict accordance with, all of its terms and conditions.  To the extent that terms appearing on the face of this Purchase Order are inconsistent with those set forth herein, the terms on the face shall govern.  Any reference on the face of this Purchase Order to Seller's proposal shall be exclusive of any terms and conditions attached to or referred to therein.

2. **Specifications.**  All goods and services furnished pursuant to this Purchase Order shall strictly conform to the specifications, descriptions and warranties set forth in this Purchase Order.  No change in this Purchase Order shall be made except upon written application to, and subsequent written authority of, Buyer.

3. **Time and Place of Delivery; Buyer's Inspection; Acceptance.**  Time is of the essence of this Purchase Order.  Delivery will be made as specified on the face of this Purchase Order.  Buyer reserves the right to reject goods and to cancel all or any portion of this Purchase Order in the event of failure to deliver at the time and place specified.  Buyer's acceptance of any part of a shipment not delivered as specified herein shall not obligate Buyer to accept the remainder of that shipment or any future shipments.  If Seller is required to provide Material Safety Data Sheets, they will be delivered to Buyer prior to delivery of any goods under this Purchase Order.  All goods shall be received subject to Buyer's inspection and acceptance, and subject to Buyer's right to reject and return at Seller's expense goods which fail to conform strictly to the requirements of this Purchase Order.  All materials are subject to inspection and testing by Buyer at manufacturer's plant.

4. **Extension of Time of Delivery.**  Buyer shall not be liable to Seller for any failure of Buyer to take any delivery hereunder when due, if occasioned by any event beyond Buyer's reasonable control, including without limitation fire, flood, earthquake, lightning or other acts of God, acts of, or compliance with the directions of, civil or military authority, including any federal, state or local agency or authority, wars, riots, insurrections, sabotage, accident, embargo, strike or other labor trouble, interruption of or delay in transportation, shortage or failure of supply of materials; or equipment breakdown.  At Buyer's option, the time for delivery hereunder shall be extended to the extent of the delay occasioned by any such circumstance and the delivery so omitted shall be made during the period of such extension.

5. **Risk of Loss.**  Risk of loss of any goods sold hereunder shall transfer to Buyer at the time and place of delivery; provided that risk of loss prior to actual receipt of the goods by Buyer shall nonetheless remain with Seller.

6. **Shipment.**  Goods must be shipped by the particular route, method and carrier as stated in this Purchase Order.  In the event that Seller fails to ship goods on or before any scheduled shipping date, Buyer shall have the right to specify a more rapid method of shipment than was specified originally and Seller shall bear, at no additional cost to Buyer, any increased costs occasioned thereby.

7. **Packing, Marking, and Invoicing.**  A packing list shall be included with each shipment.  Two copies of Seller's invoices, together with original bills of lading, properly signed by carrier's representative, shall be forwarded to Buyer not later than the day after shipments are made.  Individual invoices shall be issued for each separate shipment.  Buyer shall not be charged for packaging, boxing, crating or cartage.  All invoices, packing lists, bills of lading, and each separate package within each shipment that clearly references piece number, Buyer's Purchase Order number and Seller's packing slip number.  Partial shipments must be identified as such on the shipping memoranda and invoices.

8. **Payment; Waiver of Liens.**  Payment to Seller may, at Buyer's option, be made by electronic funds transfer (EFT).  Payment will be made following receipt and acceptance of the goods and receipt, in proper form and substance, of all documentation required by this Purchase Order.  Seller shall furnish to Buyer any analysis or breakdown of the price as Buyer may reasonably request.  This Purchase Order shall not be billed at prices higher than last quoted or charged by Seller, except as expressly agreed by Buyer.  As a condition to any payment hereunder, Seller shall furnish to Buyer, upon request, an executed waiver of liens and claims in form reasonably satisfactory to Buyer.  Seller agrees to indemnify, defend and hold harmless Buyer from and against any and all liens and encumbrances arising out of Seller's performance of this Purchase Order or rising out of any claim for payment by any laborer, subcontractor or supplier of Seller.

9. **Seller's Warranties.**  Seller expressly warrants that for a period of one year after Buyer's acceptance of the goods or services hereunder, or for such longer period as may be expressly provided in this Purchase Order or under applicable law, all goods and services covered by this Purchase Order will: (a) strictly conform to Seller's specifications, drawings, samples and other written materials and descriptions, or, to the extent the goods were purchased to Buyer's specifications and drawings as set forth or referred to in this Purchase Order, that the goods strictly conform with those specifications and drawings, (b) be free from defects in design, materials and workmanship, (c) be of merchantable quality and suitable for the particular purposes intended, whether express or reasonably implied, and (d) bear all markings, labels, and markings required by applicable laws and regulations.  In addition, Seller warrants that: (e) none of the goods covered hereby, to the extent they are subject to laws prohibiting adulteration or misbranding, is adulterated or misbranded within the meaning of such laws as of the date of delivery to Buyer; (f) all goods covered hereby may be introduced into interstate commerce without violation of applicable laws and regulations, (g) all services have been performed in a good and workmanlike manner; and (h) all goods and services furnished or rendered pursuant to this Purchase Order have been produced, sold, delivered or rendered to Buyer in compliance with all applicable laws and regulations, including those set forth in Section 14.

10. **Buyer's Remedies.**  Buyer's acceptance of all or any part of the goods or services provided hereunder shall not be deemed a waiver of the failure of such goods or services to conform to all of the warranties set forth in Section 9.  Buyer retains the right to cancel any portion of the remaining order, to reject any portion of the goods or services delivered, or to require acceptance as to any portion of the goods or services accepted, and return such goods to Seller and to recover the purchase price, any excess costs of cover, and damages, including manufacturing costs, costs of removal or recall, transportation and custodial expenses, injury to person or property incurred by Buyer, all in addition to Buyer's other remedies under this Purchase Order or applicable law.  If Seller becomes insolvent or makes an assignment for the benefit of creditors, or files or has filed against it any petition in bankruptcy, Buyer shall have the right to cancel this Purchase Order immediately.

11. **Patent, Copyrights, Trademarks.**  Seller warrants that the goods furnished under or used in connection with this Purchase Order (except those furnished according to Buyer's specific design) and Buyer's express or reasonably implied intended use thereof, do not and will not infringe any patent, copyright, trademark, trade secret or other proprietary right of any third party.  If any claim, suit or proceeding is made or instituted against Buyer alleging any such infringement, Seller shall indemnify, defend and hold Buyer harmless from and against any damages, liabilities, judgments, costs and expenses (including without limitation reasonable attorney's fees) it may incur in connection with any such claim, suit or proceeding.  In the event that the goods or Buyer's use of them in any suit or proceeding to constitute an infringement, or if Seller determines that there is a substantial risk of a finding of such infringement, Seller agrees, as appropriate, and at its expense to  (a) procure for Buyer, at no expense to Buyer, the right to continue using the goods, (b) replace the goods with equivalent goods that meet the requirements of this Purchase Order and that do not infringe any such rights, or (c) modify the goods so that they become non-infringing.

12. **INDEMNIFICATION.**  To the fullest extent permitted by law, Seller agrees to indemnify, defend, and hold harmless Buyer, its affiliates, and their respective directors, officers, employees and agents (the "Indemnified Parties") from and against all claims, demands, causes of action, losses, costs and expenses (including without limitation reasonable attorneys' fees and costs of defense) (collectively, "Losses") arising out of or incident to Seller's performance hereunder, or the presence of Seller, its employees, agents or invitees ("Seller Parties") on Buyer's premises, provided that such Losses are attributable to (a) the negligence or willful misconduct of the Seller Parties, (b) the failure of the Seller Parties to comply with applicable laws, or (c) bodily injury, sickness, disease or death (including but not limited to bodily injury, sickness, disease or death of the employees of Seller or Buyer), or to damage to or destruction of tangible property (including the loss of use thereof); in each case regardless of whether or not caused in part by the negligence or other fault of any Indemnified Party hereunder; provided that Seller shall not be liable for Losses caused by the sole negligence or willful misconduct of any Indemnified Party.

Seller's indemnification obligations under this Section 12 shall not be limited by applicable Workers' Compensation or other disability or employee benefit laws, and, solely as respects the indemnities set forth in this Section, Seller hereby expressly waives any rights it may have to assert any immunities or defenses that it may have under such laws against any Indemnified Party.

13. **Labor, Work and Services; Insurance.**  In supplying any services hereunder, Seller warrants that it is, and undertakes such performance as, an independent contractor, with sole responsibility for the payment of all federal and/or state unemployment insurance, social security and/or other similar taxes incurred hereunder.  Any

performance by Seller under this Purchase Order on Buyer's premises shall be in full compliance with Buyer's safety and other rules and procedures and with all federal and state laws and regulations regarding workplace safety, including without limitation, laws pertaining to occupational safety and health.  Prior to commencement of any services hereunder on Buyer's premises and until the satisfactory completion thereof, Seller shall, at its expense, maintain the following minimum insurance coverages on an "occurrence" basis (and not on a "claims made" basis):

| Kind of Insurance | Minimum Limits |
|---|---|
| Workers' Compensation* | Statutory |
| Employer's Liability | $1,000,000 bodily injury by accident, each accident |
|  | $1,000,000 bodily injury by disease, policy limit |
|  | $1,000,000 bodily injury by disease, each employee |
| Commercial General Liability including Contractual Liability and Products/Completed Operations | Combined Single Limits: $1,000,000 Occurrence $2,000,000 General Aggregate; $2,000,000 Products/ Completed Operations Aggregate |
| Business Auto Liability Symbol 1 (Any Auto) including Hired and Non-Owned Autos | Combined Single Limits: $1,000,000 per accident |

* Seller must obtain Workers' Compensation insurance if available.

Seller shall furnish to Buyer certificates of insurance showing the above coverages with an insurer with an AM Best rating of "A VIII" or better and providing for at least thirty (30) days prior written notice of cancellation or modification resulting in a reduction below the required minimum coverages and naming Buyer as an additional insured under Commercial General Liability using ISO form CG 20 26 or its equivalent, or in the case of Buyer's distribution of Seller's products, ISO form CG 20 15 or its equivalent.  If Seller fails to furnish such certificates or maintain such insurance, Buyer shall have the right to cancel this Purchase Order immediately.  Seller, for itself and its insurers, hereby waives subrogation against Buyer, and Seller agrees that, with respect to claims against Buyer arising out of Seller's performance hereunder, Seller's insurance shall be primary and Buyer's insurance shall be excess and non-contributory.  Seller's obligations to maintain such insurance shall in no way limit the liability or obligations assumed by Seller hereunder.

14. **Laws and Regulations.**  All goods furnished or services rendered pursuant to this Purchase Order shall be produced, sold, delivered, or rendered to Buyer in compliance with all applicable laws and regulations, including without limitation, the Federal Fair Labor Standards Act of 1938, as amended, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, Section 503 of the Rehabilitation Act of 1973, Executive Order 11246, Section 402 of the Vietnam Veterans' Readjustment Assistance Act of 1974, the Occupational Safety and Health Act of 1970, as amended ("OSHA"), (in the event of a conflict between the requirements of OSHA and any industry codes or standards applicable to this Purchase Order, the more stringent requirement shall apply), the Noise Control Act of 1972, all applicable environmental laws and regulations, including without limitation, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, and the standards of accessibility set forth in Section 402 of the Americans with Disabilities Act, and the rules, regulations and orders pertaining to the above.

Seller also agrees that the following clauses from the Code of Federal Regulations shall also apply to this Purchase Order and shall be incorporated herein by reference:  the Equal Employment Opportunity Clause, the Certification of Nonsegregated Facilities required by paragraph (7) of Executive Order 11246, the Utilization of Minority Business Enterprises and the Minority Business Enterprises Subcontracting program clauses, the Affirmative Action for Handicapped Worker's clause, and the Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era clause are, by this reference, incorporated herein and made part hereof.

15. **Termination.**  Buyer may at any time, without cause, terminate this Purchase Order in whole or in part upon written notice to Seller.  In such event, Seller shall be entitled to a reasonable termination fee consisting of a percentage of the Purchase Order price reflecting the percentage of the work, goods delivered or services properly performed prior to termination.  Payment of such termination fee shall be Seller's sole remedy.  Upon Buyer's request, Seller shall preserve, protect and deliver to Buyer, at Buyer's expense, materials on hand, work in progress, and completed work, both in its own and in its suppliers' plants.

16. **Assignment and Set-Off.**  Seller shall not assign its rights or delegate its performance hereunder, nor any interest herein, without Buyer's prior written consent and any attempted assignment or delegation without such consent shall be void.  Buyer shall be entitled at all times to set-off any amount owing from Seller to Buyer, whether under this Purchase Order or otherwise, against any amounts otherwise payable to Seller.

17. **Confidentiality.**  Seller and its directors, officers, employees and agents shall not disclose to any third party any information pertaining to the goods provided or services performed hereunder, or pertaining to Buyer's business or operations which Seller obtains or has access to in connection herewith, without the prior written consent of Buyer.

18. **No Waiver of Defaults.**  No failure by Buyer to enforce at any time any of the terms or conditions of this Purchase Order shall constitute a waiver thereof or in any way impair Buyer's right at any time to avail itself of such remedies as it may have or enforce such terms or conditions.  Waiver by Buyer hereunder will be effective unless in writing and signed by Buyer.

19. **Survival; Remedies Cumulative.**  All agreements and representations of Seller herein (including those regarding, confidentiality, indemnification and warranties) shall survive delivery and final payment hereunder, or any earlier termination hereof.  All of the rights and remedies available to Buyer hereunder are in addition to  and not in limitation of, the rights and remedies otherwise available at law or in equity.

20. **Severability.**  Any provision of this Purchase Order that is unenforceable in any jurisdiction shall be ineffective to the extent of such unenforceability (but shall be enforced to the maximum extent permissible) without invalidating the remaining provisions hereof.

21. **Governing Law.**  This Purchase Order shall be governed by the laws of the state from which Buyer issues the Purchase Order, without giving effect to its principles of conflicts of law.

# EXHIBIT H



June 24, 2013, 2013

Mr. Ron Gangemi, CEO
BIPV Inc.
908 Taylorville Road, Suite 203
Grass Valley, CA 95949

Dear Ron,

Please consider this letter as a response to your letter to me dated May 15, 2013.  CertainTeed unequivocally rejects BIPV's claims and its demand for $2,250,000 as stated in your letter. While I understand BIPV's disappointment in CertainTeed's cancellation of Purchase Order Number 3000160722 (the "PO") and the Supply Agreement, please note that both terminations were for valid reasons permissible under the terms of each document.

Section 3 of the Supply Agreement permits termination of the Supply Agreement for any reason; further, the Supply Agreement in and of itself does not create a binding obligation to purchase a certain quantity of products. Regarding the PO, as stated on the PO, the PO is subject to CertainTeed's purchase order terms and conditions.  Section 10 of the PO terms and conditions permits CertainTeed to cancel any portion of a PO due to (among other things) defective or non-merchantable product.  As stated in multiple correspondences to BIPV, CertainTeed is terminating its relationship with BIPV because of BIPV's product failure/ defect.

As a general comment, I find BIPV's demand of $2,250,000 perplexing considering that if CertainTeed purchased all products as stated in the PO only ~ $1,200,000 (original PO of $1,649,000 less purchases of about $454,000) would have to be paid to BIPV *and* CertainTeed would have product to show for it.  Demanding any more than that amount is not justified in even the wildest of scenarios.

Finally, should BIPV pursue the court system to resolve any dispute concerning the PO or Supply Agreement, CertainTeed is prepared to file a counterclaim against BIPV which will include claims against BIPV for BIPV's failure to abide by its warranty in not buying back CertainTeed's inventory, costs in connection with the evaluation of roofs where the BIPV product has been installed (e.g. thermal scans, inverter replacement) and damage to CertainTeed's reputation due to use of BIPV's faulty product.

Please note that this letter shall not serve as a waiver of any of CertainTeed's rights or remedies, all of which are hereby expressly reserved.

Sincerely,

Mark Stancroff
Director, Solar Business
CertainTeed Roofing

SAINT-GOBAIN
CertainTeed Roofing
750 E. Swedesford Road • PO Box 860 • Valley Forge, PA 19482 • USA • Tel: (610) 341-7000 • www.certainteed.com

# EXHIBIT I

# LAW OFFICES OF ANDREW A. HARRIS, A.P.C.

970 East Main Street, Suite 202
Grass Valley, California  95945
*www.AndrewAHarris.com*
*andy@andrewaharris.com*
(530) 271-2244
Facsimile:  (530) 271-2246

Marsha A. Burch, *Of Counsel*

December 23, 2015

<u>Via Certified Mail</u>

CertainTeed Corporation
Attention:  Legal Department
20 Moores Road
Malvern, PA 19355

      Re:    Claims of BIPV, Inc.

Dear Counselor:

We represent BIPV, Inc. (the "Company") with respect to claims it has against CertainTeed Corporation and its parent, affiliates and certain officers ("CertainTeed").  Those claims are described in the enclosed draft complaint and in the enclosed letter and e-mail exchange the last time the Company through its intellectual property attorney attempted to resolve this dispute with CertainTeed.  The Company's attempt was acknowledged and a promise was made to investigate the Company's claims.  CertainTeed has had ample time to investigate the Company's claims and the time has come to resolve them.

The Company delayed in following up on these matters in an attempt to pursue other business endeavors.  Now it is time to re-visit the claims and resolve them.  Enclosed are photographs showing how CertainTeed has used some of the Company's trade secrets obtained during the due diligence process, which secrets were protected under the nondisclosure agreements referenced in the enclosed draft complaint, and based upon products supplied under the purchase order breached by CertainTeed.  Based on our research and analysis, we believe a jury will conclude the products in the photographs being sold by CertainTeed Corporation, and potentially other products as discovered, incorporate the Company's trade secrets.  Our research and analysis further indicates that CertainTeed has received gross profits exceeding $41 million using the Company's trade secrets.  We believe a jury will find for the Company on the enclosed draft complaint, award damages in excess of $20 million, order CertainTeed to disgorge its profits, and the Court will restrain CertainTeed from using the Company's technology.  There also is the potential for an award for punitive damages and recovery of the Company's attorneys' fees.

CertainTeed Corporation
Attention: Legal Department
December 23, 2015
Page Two

We believe the dispute and the amount at stake warrants serious settlement negotiations. The Company believes CertainTeed previously acknowledged and will acknowledge again the benefit of resolving this dispute amicably through agreeable business terms. The Company prefers to put its resources to use in resolving this dispute rather than engaging in protracted and expensive litigation. If necessary, the Company would be amenable to mediation with the American Arbitration Association in San Francisco.

If CertainTeed agrees to engage in settlement discussions and or mediate the dispute, the Company requests that the defendants named in the enclosed draft complaint stipulate to toll the statutes of limitation applicable to the claims asserted in the enclosed draft complaint, to which the Company would reciprocate and stipulate to a tolling of all defenses available to the named defendants. It seems that your department would have a form of tolling agreement. If not, we would be willing to co-draft one.

Please let us hear from you on behalf of the defendants named in the enclosed draft complaint by the close of business on January 8, 2016. If we do not hear from you by that time, the Company shall assume CertainTeed Corporation and the defendants named in the enclosed draft complaint are not interested in working amicably toward a resolution of the Company's claims and will proceed accordingly.

Thank you for your prompt attention to this matter.

Yours truly,

LAW OFFICES OF ANDREW A. HARRIS, A.P.C.

Andrew A. Harris

Enclosures as stated

Cc:     Client
        Alexander H. Plache (by e-mail to Alex.h.plache@saint-gobain.com)