# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CERTAINTEED CORP., | : | |
|     Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BIPV, INC., | : | No. 16-57 |
|     Defendant. | : | |

### MEMORANDUM

**Schiller, J.**                                                                                                                                  **May 1, 2017**

All seemed sunny when CertainTeed and BIPV forged a business deal to work on solar panels. The parties entered into four agreements: two nondisclosure agreements, a private label supply agreement, and a purchase order in which CertainTeed bought products from BIPV.

BIPV now accuses CertainTeed of misappropriating its trade secrets and breaching both nondisclosure agreements and the purchase order. CertainTeed accuses BIPV of breaching the purchase order. Presently before the Court is CertainTeed's motion for summary judgment. For the reasons that follow, the Court concludes that BIPV breached the purchase order and lacks a protected trade secret, and so enters judgment in CertainTeed's favor on those claims. There are disputed facts, however, concerning whether CertainTeed breached the two nondisclosure agreements. Therefore, the Court will deny summary judgment on those claims.

### I. BACKGROUND

#### A. CertainTeed and BIPV Meet

CertainTeed is a worldwide building materials manufacturer that makes solar roofing panels. (Statement of Undisputed Facts of CertainTeed Corp. [CertainTeed Facts] ¶ 1.) BIPV, which was

founded by Ronald Gangemi, designs, develops, and sells roofing panels that use solar power generating cells. (*Id*. ¶ 2.)

Since as early as 2009, BIPV, beginning with its predecessor-in-interest, Sun Energy, built and sold a building integrated photovoltaic solar panel that would mount to a roof alongside shingles and tiles. (*Id*. ¶ 4.) This panel generated electricity similar to traditional solar panels, but BIPV's panel could be installed alongside asphalt shingles. (*Id*. ¶ 6.) BIPV marketed and displayed its panel at the Solar Power International Trade Show trade show in California on October 12, 2010. (*Id*. ¶ 9.) CertainTeed first encountered BIPV at the trade show when two CertainTeed representatives met Gangemi. (*Id*. ¶ 11.) The parties discussed BIPV's design and the possibility of entering into a business relationship. (*Id*. ¶ 12.)

### B. The Agreements

Subsequent to this meeting, CertainTeed and BIPV entered into four written agreements.

The first agreement was a nondisclosure agreement dated October 28, 2010. The parties desired a business relationship concerning "Roof Integrated Photovoltaic Products and Associated Components and Accessories and Development Thereof." (Mot. for Summ. J. of CertainTeed Corp. [the "CertainTeed Summ. J. Mot."] Ex. J [the "2010 nondisclosure agreement"].) The agreement recognized that both parties had confidential information that would have to be revealed to the other side during their discussions. (*Id*.) Specifically, the parties noted that "[i]n the course of discussions between the parties relating to the Project, each party has disclosed or may disclose to the other party certain of its proprietary know-how and other confidential information." (*Id*.) Confidential information included "information regarding customers, suppliers and business arrangements, technical and business data, know-how, processes, designs and ideas." (*Id*.) Confidential information

also encompassed "information relating to the Project, including the details thereof and the fact that the Project is under consideration." (*Id*.) The parties agreed that confidential information would not be disclosed to third parties "[e]xcept with the prior written consent of the disclosing party or as specifically provided herein." (*Id*.) Moreover, confidential information could only be used for purposes of the project the parties hoped to undertake. (*Id*.)

The 2010 nondisclosure agreement included four "permitted exceptions" to disclosure of confidential information. Under exceptions one and two, a recipient of confidential information "shall be under no obligation" with respect to that confidential information if the confidential information "[became] generally available to the public other than as a result of a breach of this Agreement by the Recipient," or if the confidential information was known to the recipient at the time of disclosure. The third and fourth exceptions applied if the confidential information was received by the recipient "on a non-confidential basis from a third party who had a legal right to make such disclosure," or "is subsequently developed by the Recipient or any of its affiliates without the use of such Confidential Information." (*Id*.) The agreement was "governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania." (*Id*.)

The second agreement was a private label supply agreement dated August 23, 2011. Pursuant to this agreement, CertainTeed agreed to buy from BIPV Sun Energy Shingles and Flashing Components "in accordance with [CertainTeed's] firm purchase orders." (CertainTeed Summ. J. Mot. Ex. K [the "private label supply agreement"].) The private label supply agreement continued until either party provided ninety days of notice in writing that it was terminating the agreement. (*Id*.) The private label supply agreement also stated that BIPV warranted to CertainTeed that BIPV's products "shall be free from defects in material and workmanship." (*Id*.)

3

The third agreement was a nondisclosure agreement dated January 6, 2012. The parties signed this agreement "[i]n connection with [CertainTeed's] consideration of a possible transaction involving BIPV, Inc." (CertainTeed Summ. J. Mot. Ex. L [the "2012 nondisclosure agreement"].) Pursuant to the 2012 nondisclosure agreement, CertainTeed agreed to keep as confidential certain "Evaluation Material" which BIPV furnished to CertainTeed. (*Id*.) The definition of "Evaluation Material" excepted information that: (1) CertainTeed already possessed that was not subject to a previous nondisclosure agreement; (2) was or became "generally available to the public other than as a result of a disclosure" by CertainTeed in violation of the 2012 nondisclosure agreement; (3) became available to CertainTeed through third parties on a non-confidential basis; or (4) was "independently developed by [CertainTeed] without use of the Evaluation Material." (*Id*.) The 2012 nondisclosure agreement was to last until that transaction between the two companies was consummated or two years after the date of the letter, whichever happened first. (*Id*.) The agreement was to be construed in accordance with the law of Pennsylvania. (*Id*.)

The final agreement at issue here is a January 31, 2012 purchase order. According to the purchase order, BIPV agreed to supply CertainTeed 4,320 units of "Apollo PV Sun Energy Shingle 52W Std Cel" for $393,120.00. (CertainTeed Summ. J. Mot. Ex. M [the "purchase order"].) CertainTeed soon thereafter began to receive reports that the panels purchased from BIPV were catching fire on some customers' roofs shortly after installation. (CertainTeed Facts ¶ 17.) CertainTeed investigated these reports, finding that the majority of the failures originated in the junction box. (*Id*. ¶¶ 18–19.) CertainTeed maintained that its investigation "conclusively ruled out other potential causes for the failure of the APOLLO I Panels, including faulty installations, rodents, weather or other *force majeure* reasons." (*Id*. ¶ 20.) CertainTeed concluded that the fires were caused

4

by a defect in BIPV's design of the junction box, which differed from standard designs in the industry. (*Id*. ¶ 22.) On April 26, 2013, CertainTeed wrote a letter to Gangemi informing him that "due to the major quality issues that we have had with the product, we will not be purchasing any more product from BIPV Inc. and are cancelling the existing PO." (CertainTeed Summ. J. Mot. Ex. P [the "April 26, 2013 letter"].) CertainTeed claims that BIPV has not reimbursed it for any of the panel failures, and that the repairs and replacements of those panels have cost $271,437.24. (CertainTeed Facts ¶¶ 25–26.) Following replacement of the junction box, there have been no panel failures. (*Id*. ¶ 27.)

### C. Procedural Background

On January 7, 2016, CertainTeed sued BIPV in this Court, seeking a declaration that CertainTeed did not breach the 2010 or 2012 nondisclosure agreements and did not misappropriate any of BIPV's alleged trade secrets. CertainTeed also alleged that BIPV breached the purchase order when BIPV provided CertainTeed with defective products. BIPV answered and filed a counterclaim against CertainTeed in which it claimed that CertainTeed breached the Lanham Act, violated the Pennsylvania Uniform Trade Secrets Act, breached the 2010 and 2012 nondisclosure agreements, and breached the purchase order.

### D. Trade Secrets and Confidential Information

BIPV claims that CertainTeed misappropriated its trade secrets. CertainTeed counters that there are no trade secrets here due to BIPV's disclosures and the fact that BIPV's alleged trade secrets can be reversed engineered.

Gangemi is the listed inventor on five abandoned patent applications for building integrated photovoltaic panel designs: (1) "System and Method for Mounting Photovoltaic Cells," published

on March 2, 2006; (2) "Roof Mounting Bracket for Photovoltaic Power Generation System," published on December 16, 2010; (3) "Roof Mounting Bracket for Photovoltaic Power Generation System," published on December 16, 2010; (4) "Roof Mounted Photovoltaic System with Accessible Panel Electronics," published on September 27, 2012; and (5) "Roof Mounted Photovoltaic System with Accessible Panel Electronics," published on October 4, 2012. (*Id*. ¶ 10.)

According to CertainTeed, prior to January 14, 2011, BIPV had performed approximately twenty installations of the BIPV panel on homes. (*Id*. ¶ 33.) BIPV did not have any nondisclosure agreements with its customers. (*Id*. ¶ 35.) BIPV also sold the BIPV Panel to at least nine customers not subject to any nondisclosure agreements. (*Id*. ¶ 36.)

CertainTeed also provided the expert report of Jonathan Albert, an engineer who concluded that BIPV's panel "would be very straight forward to reverse engineer. There is nothing about the design that would be difficult to recreate and it could be done so quickly." (CertainTeed Summ. J. Ex. I [the "Albert Expert Report"].) He estimated that it would take six weeks to recreate the engineering and design which could then be used to create a product "virtually identical" to BIPV's product. (*Id*.) Albert opined that the BIPV panel included nothing that would constitute an industry secret because each of BIPV's design components were either generally known to the industry or could have been reverse engineered using common industry knowledge. (*Id*.) According to CertainTeed's expert, "both the design of the component parts and materials [of the BIPV Panel] are commonly used in this industry." (CertainTeed Facts ¶ 47.) CertainTeed asserts that the same is true of the laminate and the backing material for the BIPV panel, as well as the assembly of the BIPV panel. (*Id*. ¶¶ 49–57.) Finally, CertainTeed claims that two of the design components that BIPV claims were misappropriated were not present in CertainTeed's solar panel. (*Id*. ¶¶ 58–70.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247. Once the moving party has met its burden, the nonmoving party must go beyond the pleadings to set forth specific facts in the record showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## III. DISCUSSION

### A. Breach of Purchase Order

CertainTeed argues that it is entitled to summary judgment on BIPV's claim that CertainTeed breached the January 31, 2012 purchase order. CertainTeed asserts that BIPV breached the purchase order when it failed to provide CertainTeed products free from defects. (CertainTeed's Mem. at 24–25.)

Under Pennsylvania law[1], a breach of contract claim consists of: (1) the existence of a contract, including its essential terms; (2) a breach of the duty imposed by the contract; and (3) damages resulting from the breach. *Glatthorn v. Independence Blue Cross*, 34 F. App'x 420, 423 (3d Cir. 2002).

CertainTeed argues that BIPV breached the purchase order when it failed to provide CertainTeed with products free from defects. (CertainTeed's Mem. at 24.) The purchase order required that BIPV's panels would be "free from defects in design, material, and workmanship." (CertainTeed's Summ. J. Mot. Ex. X [the "purchase order terms and conditions"].)

Beginning in September 2012, CertainTeed began receiving reports that the panels it received from BIPV were catching fire on some customers' roofs shortly after installation. (CertainTeed Facts ¶ 17.) CertainTeed investigated these failures and ultimately concluded that the failures were the result of a defect in BIPV'S design of the junction box. (*Id.* ¶¶ 17–22.)

BIPV does not dispute CertainTeed's account of the failure of the panels. Indeed, "BIPV agrees that each of CertainTeed's Statement of Undisputed Facts, No. 1 to No. 70, are each undisputed." (BIPV's Resp. to CertainTeed Corp.'s Statement of Undisputed Facts and BIPV's Separate Statement of Undisputed Facts [BIPV's Facts] at 1.) Thus, there is no dispute about CertainTeed's conclusion that BIPV provided defective products. Instead, BIPV argues that because CertainTeed breached the 2010 and 2012 nondisclosure agreements and the private label supply agreement, BIPV was excused from all liability under the contract. (BIPV's Mem. at 24.) BIPV also

---

[1] CertainTeed writes that the terms of the purchase order dictate that California law applies to that agreement and that either Pennsylvania or California law applies to the private label supply agreement. (CertainTeed's Mem. at 24 n.9.) However, no conflict exists regarding the elements of a breach of contract between California and Pennsylvania law, so the Court will apply Pennsylvania law.

argues that it should be allowed to challenge at trial the conclusion that its products were defective. (*Id*.)

These arguments are unpersuasive. Having admitted to CertainTeed's facts regarding the cause of the defects, there is nothing for a jury to decide regarding the defects. Moreover, BIPV provided no evidence to counter the evidence presented by CertainTeed. Once presented with a properly supported summary judgment motion, BIPV cannot simply ask the Court to deny the motion so that its attorneys can challenge undisputed facts at trial. Finally, the Court is unclear why breach of the 2010 or 2012 nondisclosure agreement or breach of the private label supply agreement would permit BIPV to breach a separate contract by shipping to CertainTeed defective products. BIPV has offered no justification for allowing it to breach one contract because CertainTeed may have breached a different agreement.

The parties agreed that BIPV would provide products free from defects, and BIPV failed to do so. Summary judgment is therefore granted in favor of CertainTeed on its claim that BIPV breached the purchase order and against BIPV on its breach of contract claim related to the purchase order.

### B. Trade Secrets

CertainTeed argues that BIPV's misappropriation of trade secrets claim fails because it is premised on the existence of a trade secret, and there is no trade secret here to sustain that claim. BIPV counters that it has protected trade secrets in design tolerances, design drawings, and safety or quality test information. (BIPV's Mem. of Law Supporting Its Resp. to CertainTeed Corp.'s Mot. for Summ. J. [BIPV's Mem.] at 20.)

Pennsylvania's Uniform Trade Secrets Act allows a plaintiff to recover damages and to get

injunctive relief against a party that has misappropriated the plaintiff's trade secret. 12 Pa. Cons. Stat. §§ 5303–04. The elements of a misappropriation of trade secrets claim under Pennsylvania law are: (1) the existence of a trade secret (2) which was communicated in confidence to the defendant and (3) was used by the defendant in beach of that confidence (4) to the detriment of the plaintiff. *See Rohm and Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429– 30 (3d Cir. 1982).

A trade secret is information kept under confidential and that has economic value because it is not common knowledge. Specifically, Pennsylvania law defines a trade secret as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302.

Courts often look to the following factors to determine whether given information is a trade secret: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985). "Matters which are fully disclosed by a marketed product" and that can be reverse engineered do not qualify as trade secrets. *Id*. at 1255.

Perhaps it goes without saying, but the Court must say it anyway: for there to be a trade secret, BIPV must be able to point to the existence of a secret. *See Syngy, Inc. v. ZS Assocs., Inc.*, Civ. A. No. 07-3536, 2015 WL 899408, at *9 (E.D. Pa. Mar. 3, 2015). Generally, it is for a jury as fact finder to decide whether a piece of information is a trade secret. *Avanti Wind Sys., Inc. v. Shattell*, Civ. A. No. 14-98, 2016 WL 3211990, at *12 (W.D. Pa. June 9, 2016). However, "factual issues are subject to summary judgment whenever the law as applied to uncontroverted facts shows that the movant is entitled to summary judgment." *Cont'l Data Sys., Inc. v. Exxon Corp.*, 638 F. Supp. 432, 441 (E.D. Pa. 1986). The Court is faced with such a situation of uncontroverted facts here. Unfortunately for BIPV, it has failed to identify any trade secrets.

CertainTeed points to nineteen design items for which it argues BIPV seeks trade secret protection. (CertainTeed's Mot. Ex. Q [the "chart of nineteen design components"].) According to CertainTeed, eight of these design items[2] are not entitled to protection because these purported trade secrets were disclosed in five abandoned patent applications. Additionally, CertainTeed asserts that none of the design components are entitled to trade secret protection because all of the design components can be reverse engineered. (Mem. in Supp. of CertainTeed's Mot. for Summ. J. [CertainTeed's Mem.] at 14.) The Court agrees.

    *1.    Patents*

Every patent application must include a specification. 35 U.S.C. § 112. "The specification shall contain a written description of the invention, and of the manner and process of making and

---

[2] The eight design items are the: (1) PV laminate and power circuit; (2) PV panel's dual wire holder; (3) PV panel's wiring design; (4) PV panel installation instructions; (5) physical dimensions; (6) J-Box location/placement; (7) PV's panel manufacturing process; and (8) overall design. (*Id.*)

using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same, and shall set forth the best mode contemplated by the inventor or joint inventor of carrying out the invention." 35 U.S.C. § 112(a). Thus, an inventor is faced with a choice: keep the secret and risk independent discovery or share the secret with the world and receive a temporary government-issued monopoly to practice the invention. *See Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 778 (Pa. 1965). "Therefore, because by definition a patent and a published patent application are matters of public record, the legal protection of trade secrets and patents are mutually exclusive." *Foster v. Pitney Bowes Corp.*, Civ. A. No. 11-7303, 2013 WL 487196, at *6 (E.D. Pa. Feb. 8, 2013) (concluding that a system could not qualify as a trade secret because the plaintiff "allowed the application to be made public when he applied for a patent").

BIPV does not dispute that the eight design items were disclosed in published patent applications. Thus, these eight items are not trade secrets entitled to trade secret protection.

### 2. *Reverse engineering*

"Reverse engineering is a process by which one analyzes a finished product and, working backwards, designs the machine capable of producing such a product." *Anaconda Co. v. Metric Tool & Die Co.*, 485 F. Supp. 410, 418 (E.D. Pa. 1980). If a product can be reverse engineered, then the product is not entitled to trade secret protection. *See Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 707–08 (E.D. Pa. 2014); *Camelot Tech., Inc. v. Radio Shack Corp.*, Civ. A. No. 01-4719, 2003 WL 403125, at *6 (E.D. Pa. Feb. 13, 2003) ("The standard in Pennsylvania regarding reverse engineering is that there is no trade secret if, at the time of disclosure or use by a misappropriation, the allegedly secret information could have been ascertained by inspection of sold articles or by

12

reverse engineering."); *Permagrain Prods., Inc. v. U.S. Mat & Rubber Co.*, 489 F. Supp. 108, 112 (E.D. Pa. 1980) ("[I]t is well-settled that where a product's secret can be determined through 'reverse engineering,' protection for the product cannot be claimed.").

To support its position regarding reverse engineering, CertainTeed included the expert report of Jonathan Albert, the Director of Engineering at Bresllergroup, a product development consultancy. Albert opined that it would be relatively simple to reverse engineer BIPV's sun energy shingle, which he reported consists of three major components: (1) the frame, which is made of plastic; (2) the photovoltaic laminate, which generates the electricity; and (3) the interconnect, which consists of the junction box, wires, and connectors, and allows the electrical energy to be routed between modules and off the roof. (Albert Expert Report.) Albert contended that the frame of BIPV's product is made by injection molding, most likely molded from polycarbonate, and perhaps reinforced with fiberglass. (*Id.*) Albert claimed that the design of the frame "could readily be recreated in 3D computer aided design using a program like Solidworks." (*Id.*) He stated that the frame could be reverse engineered using 3D scanning. (*Id.*) However, "[d]ue to the simple geometry of the SES Frame, it is more likely that it would be reverse engineered using a ruler and a pair of calipers." (*Id.*) Albert estimated that the process of reverse engineering the frame would take no more than a week or two. (*Id.*)

Next, Albert described the laminate, which he claimed "is typical for a photovoltaic module and is not substantially different from what you find in a standard photovoltaic module." (*Id.*) The construction technique remains largely unchanged since its development in the 1980s. (*Id.*) According to Albert, "[t]he Laminate is produced using the standard connection and vacuum lamination process that are used to make virtually all photovoltaic laminates." (*Id.*) He believed that

a laminate company would need a few weeks to provide product samples once the company was provided with a two-dimensional drawing. (*Id*.) Moreover, "[t]he photovoltaic industry has to a great extent standardized on laminate construction." (*Id*.)

With respect to the junction box, Albert stated that BIPV used a custom, injection-molded junction box, but that similar standard junction boxes were available from many companies. (*Id*.) Albert also opined that assembly of the product was easy to do by hand and required no specializes machinery. (*Id*.)

Ultimately, Albert concluded that "any skilled engineer who was familiar with photovoltaic modules could quickly reverse engineer the engineering and design from the [Sun Energy Shingle] module. The reverse engineering would not be difficult and would not be overly costly or overly time consuming. The [Sun Energy Shingle] module is not materially different in engineering, design, or performance from other of the many similar modules that are on sale now or were prior to 2010." (*Id*.) Finally, he also opined that the nineteen design components BIPV argues are protected trade secrets could be easily and readily reverse engineered. (*Id*.)

BIPV does not directly counter CertainTeed's reverse engineering argument. Instead, BIPV has submitted the report of Jeff Kotowski, an electrical engineer and a purported expert who opined that information and technology used by CertainTeed to design and develop its solar shingle were developed or modified by BIPV. CertainTeed has filed a motion seeking to exclude the expert report of Kotowski. Even accepting Kotowski's conclusion, however, his conclusion fails to address CertainTeed's reverse engineering and patent arguments. Accepting that CertainTeed used BIPV's information and technology is of no moment if none of that information or technology is a confidential trade secret. And the uncontroverted facts from the record demonstrate the information

14

BIPV seeks to protect is not a trade secret. BIPV argues that certain design tolerances, design drawings, and safety or quality test information are trade secrets that cannot be reverse engineered. But while these categories of information can qualify as trade secrets under certain circumstances, BIPV has cited nothing in the record to suggest that these categories constitute misappropriated trade secrets in this case. Despite a significant amount of time for discovery, BIPV remains unclear about precisely what secrets it is trying to protect. Only CertainTeed has pointed to actual items used in CertainTeed's product which have incorporated BIPV's potential trade secrets, and the Court has concluded that those items did not incorporate actual trade secrets.

The Court concludes that CertainTeed is entitled to summary judgment on BIPV's trade secrets misappropriation claim. Because the Court concludes that CertainTeed's patent and reverse engineering arguments foreclose the possibility of a protected trade secret here, the Court will not address CertainTeed's argument that public sales, installations, and disclosures foreclose trade secret protection. The Court will also enter judgment in favor of CertainTeed and against BIPV on all trade secret misappropriation claims.

### C. Breach of the Nondisclosure Agreements

CertainTeed argues that the Court must also enter judgment in its favor on the issue of the alleged 2010 and 2012 nondisclosure agreements. According to CertainTeed, the breach of contract claims must rise or fall with the trade secret claim; if there was no trade secret or confidential information provided, there could be no disclosure of a trade secret or of confidential information. (*See* CertainTeed's Mem. at 7 ["BIPV's Trade Secrets and Breach of Contract Claims are premised on the same claim . . . If what BIPV claims to have provided is not secret or confidential, its claims fail."].) BIPV claims that the 2010 and 2012 nondisclosure agreements do not speak of trade secrets,

but rather apply to information "generally known to the public." (BIPV's Mem. at 17.)

The Court agrees with BIPV. As a matter of law, there is no trade secret to protect here. It does not necessarily follow, however, that BIPV did not provide CertainTeed with confidential information, as contemplated by the parties. The 2010 and 2012 nondisclosure agreements do not speak of trade secrets. Rather, they speak of confidential information and material generally available to the public. The legal definition of trade secret may not be identical to the definition of confidential information or evaluation material, as understood by the parties. CertainTeed notes that both nondisclosure agreements include exceptions from their scope for information which "is or becomes generally available to the public." The Court, however, believes that a fact finder must decide whether the information provided by BIPV to CertainTeed was or became available to the public. Without that decision, it is impossible to say whether CertainTeed breached either or both of the nondisclosure agreements. Accordingly, CertainTeed's motion for summary judgment with respect to the breach of contract of the 2010 and 2012 nondisclosure agreements is denied.

## IV. CONCLUSION

BIPV does not dispute CertainTeed's contention that BIPV provided it defective products. Accordingly, the Court concludes that BIPV breached the purchase order and will grant summary judgment in favor of CertainTeed with respect to CertainTeed's breach of contract claim. The Court concludes that there is no trade secret entitled to protection here. Therefore, summary judgment is granted in favor of CertainTeed with respect to BIPV's trade secrets claim. However, a jury must determine whether or not CertainTeed breached the 2010 and 2012 nondisclosure agreements between the parties. The Court will therefore deny CertainTeed's motion for summary judgment with

respect to those two agreements. An Order consistent with this Memorandum will be docketed separately.